In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-3049

FIRST MIDWEST BANK, Guardian of the Estate
of Michael D. LaPorta, a disabled person,

*Plaintiff-Appellee,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 9665 — **Harry D. Leinenweber**, *Judge.*

ARGUED DECEMBER 10, 2019 — DECIDED FEBRUARY 23, 2021

Before SYKES, *Chief Judge*, and KANNE, *Circuit Judge*.[1]

---

[1] The Honorable Amy Coney Barrett, Associate Justice of the Supreme
Court of the United States, was a judge of this court and member of the
panel when this case was submitted but did not participate in the
decision and judgment. The appeal is resolved by a quorum of the panel
pursuant to 28 U.S.C. § 46(d).

SYKES, *Chief Judge*. Patrick Kelly shot his friend Michael LaPorta in the head during an argument at the end of a night of drinking together. LaPorta's injuries left him severely and permanently disabled. Kelly, a Chicago police officer, was off duty and not acting under color of state law at the time of the shooting. LaPorta nevertheless sued the City of Chicago under 42 U.S.C. § 1983, which provides a federal remedy against state actors who deprive others of rights secured by the federal Constitution and laws. He sought damages for the injuries he suffered at Kelly's hands.

The theory of the case was novel. LaPorta claimed that the City had inadequate policies in place to prevent the shooting—or more precisely, that the City's policy failures caused Kelly to shoot him. He identified several policy shortcomings: the failure to have an "early warning system" to identify officers who were likely to engage in misconduct, the failure to adequately investigate and discipline officers who engage in misconduct, and the perpetuation of a "code of silence" that deters reporting of officers who engage in misconduct. A jury found the City liable and awarded $44.7 million in damages. The City moved for judgment as a matter of law, and the district court denied the motion.

We reverse. LaPorta's injuries are grievous, but his legal theory for holding the City liable is deeply flawed. Whatever viability it might have had under state tort law (we're skeptical, but there's no need to make a prediction), it has no foundation whatsoever in constitutional law. When Kelly shot LaPorta, he was not acting as a Chicago police officer but as a private citizen. LaPorta claimed that he was deprived of his due-process right to bodily integrity. But it has long been settled that "a State's failure to protect an individ-

ual against private violence … does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). We remand with instructions to enter judgment for the City.

## I. Background

Late one night in January 2010, LaPorta went drinking with his friend Patrick Kelly, a Chicago police officer. It's undisputed that Kelly was off duty at the time of these events. After patronizing two bars, the friends went to Kelly's house. At some point Kelly began hitting his dog. LaPorta yelled at him to stop and said he was leaving. Kelly then shot LaPorta in the head.[2] LaPorta survived but suffered traumatic brain injuries that left him severely and permanently disabled. He is unable to walk, has cognitive deficits, and cannot use his right arm. He is blind in one eye and deaf in one ear.

LaPorta filed suit in state court against the City of Chicago and other defendants; initially he raised only state-law claims for relief. LaPorta's father, as his son's guardian, substituted as plaintiff in October 2011, and three years later he amended the complaint to add a claim against the City under § 1983 for violation of LaPorta's right to due process. The City removed the case to federal court. First Midwest Bank later replaced LaPorta's father as his guardian and was

---

[2] At trial the City disputed LaPorta's account and instead argued that LaPorta shot himself with Kelly's gun. Because we are reviewing a denial of a motion for judgment as a matter of law, we view the evidence in LaPorta's favor. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019).

substituted as the plaintiff. For ease of reference, we continue to refer to LaPorta as the plaintiff.

The City moved to dismiss, arguing that the complaint failed to allege a cognizable constitutional violation and thus could not support municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Relying largely on *Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990), the judge denied the motion. After discovery the City moved for summary judgment, noting again the absence of any constitutional violation. Citing *DeShaney*, 489 U.S. at 196–97, the City argued that it had no constitutional duty to protect LaPorta from Kelly's private violence. The judge denied the motion, again relying on *Gibson*. *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 986–87 (N.D. Ill. 2017).

At trial LaPorta testified about the shooting and its aftermath. Kelly invoked his Fifth Amendment right to remain silent. Beyond the transactional witnesses, most of LaPorta's case focused on Kelly's history of civilian and internal disciplinary complaints and evidence about the Chicago Police Department's policies—or more specifically, its policy failures. LaPorta identified three general policy deficiencies: (1) the City failed to implement an "early warning system" to identify problem officers; (2) it failed to adequately investigate and discipline officers who engaged in misconduct; and (3) it fostered a "code of silence" that deterred reporting of officers who engaged in misconduct.

The theory of LaPorta's case was that these policy failures produced a deep-rooted culture of tolerating and covering up officer misconduct, which led Kelly to believe that he could shoot LaPorta with impunity. LaPorta's counsel told the jury that the case was about more than the

violation of LaPorta's constitutional rights; it was about the
need for systemic reform in the Chicago Police Department.

More specifically, in closing argument LaPorta's counsel
repeatedly argued that by finding the City liable, the jury
could help to bring about desperately needed institutional
reform in the Chicago Police Department and improve the
relationship between the police and citizens. Here's a taste:

> No more distinctions between "us" and
> "them," citizens and police. Let's make the
> streets safer for both by bringing back the trust.
> Why is there no trust? Because there's no
> transparency. Why is there no transparency?
> Because it's an "us versus them" attitude. And
> we need to bridge that. And when I say "we," I
> actually mean you.

> You have the power to do it. … If you should
> find that the City did, indeed, through Patrick
> Kelly violate Michael LaPorta's constitutional
> rights and if you find that it engaged in cus-
> tom[ary], widespread policies, then you have
> that power to bring forth that change.

> Real reforms can only begin after a judgment is
> brought forth. Without that, there is no justice.
> Real changes can be made, a new order and
> trust can be restored to the community that
> both citizens and police officers share. Yes,
> your task is monumental. It's big.

Again and again, counsel exhorted the jury to seize the
opportunity to reform the Chicago Police Department by
holding the City liable:

> [D]on't we want that change in culture? Of
> course, we would pass the buck to someone
> else. We would leave it up to the City, but you
> heard from a city councilman and from the
> mayor that time and again, attempts to reform
> from within have failed. …

> You are now in the driver['s] seat, and you
> have the ability to police the police.

To kickstart a transformation this large, counsel urged the jury to set the damages award high enough to send a message and bring about needed reform. To that end, he argued that the Chicago Police Department had

> a longstanding culture and attitude that won't
> get changed unless there's a massive mandate.
> It can't be little.

> The message has to be sent: You cannot do this
> again, whether it's with Patrick Kelly or any of
> the other officers that rise above him in the
> number of complaints because there are many,
> many more officers out there, ladies and gen-
> tlemen, that are worse than Patrick Kelly.

The City objected to this mode of argument, but the judge overruled the objection.[3] LaPorta's counsel ended his

---

[3] That was error. This form of argument is plainly improper. In asking the jury to award damages high enough to deter future misconduct rather than compensate LaPorta for his injuries, counsel was asking the jury to award punitive damages. But a municipality is immune from punitive damages. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). The judge acknowledged the error when ruling on the City's motion for remittitur but concluded that it was harmless.

closing argument by reading a fictitious letter that he had written purporting to be from LaPorta to his parents and brother. The "letter" apologized for being a burden and expressed deep pain that he would never be able to marry, have children, or take over the family business. The City objected to this line of argument too, but the judge overruled the objection.

The substantive jury instruction on the due-process claim told the jury to first consider whether LaPorta proved by a preponderance of the evidence that Kelly "intentionally or with reckless indifference" shot him. If he proved this, then the jury was instructed to consider whether he also proved "each of the following things":

> One, prior to Michael D. LaPorta's shooting, the City of Chicago had one or more of the following policies: Failing to maintain an early warning system that would identify officers who would engage in misconduct in the future; maintaining a code of silence in which officers failed to report misconduct or covered up the misconduct of other officers; failing to terminate officers who engaged in serious misconduct; failing to discipline officers who engaged in misconduct; and/or failing to investigate allegations of officer misconduct.

> The second thing – there's two. One or more of the policies described in Paragraph 1 caused Patrick Kelly to intentionally or with reckless indifference shoot Michael D. LaPorta.

> Three, the Chicago City Council knew that be-
> cause one or more of the policies described in
> Paragraph 1 existed and was allowed to con-
> tinue, it was highly predictable that its off-duty
> officers would violate the bodily integrity of
> persons they came into contact with because
> there was a pattern of similar constitutional vi-
> olations or it was highly predictable even
> without a pattern of similar constitutional vio-
> lations.

The instruction concluded: "If you find that Plaintiff has proved each of these things by a preponderance of the evidence, then you must decide for Plaintiff and go on to consider the question of damages."

The jury returned a verdict for LaPorta and awarded $44.7 million in damages. The jurors concluded that two of the City's policies—its failure to maintain an adequate early warning system and its failure to adequately investigate and discipline officers—caused Kelly to shoot LaPorta.

The City moved for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. Relying again on *DeShaney*, the City argued that it had no constitu-tional duty to protect LaPorta from Kelly's private violence. The judge denied the motion, concluding that *DeShaney* was inapplicable. The City also moved for a new trial based on several trial errors, including the "send a message" closing argument by LaPorta's counsel and his fictitious letter purporting to be from LaPorta to his family. The judge denied that motion as well. This appeal followed.

**II. Discussion**

The City challenges the denial of its motion for judgment as a matter of law. We review that ruling de novo. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019). The City also renews its request for a new trial based on counsel's improper remarks during closing argument. Because we agree with the City's first argument, we have no need to reach the second.

Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress … .

The statute thus provides a remedy for violations of federal rights committed by persons acting under color of state law. To prevail on a § 1983 claim, the plaintiff must prove that "(1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).

An action is not "under color of state law" merely because it is performed by a public employee or officer; the action must be "related in some way to the performance of

the duties of the state office." *Barnes v. City of Centralia*, 943 F.3d 826, 831 (7th Cir. 2019) (quotation marks omitted).

A municipality is a "person" under § 1983 and may be held liable for its own violations of the federal Constitution and laws. *Monell*, 436 U.S. at 690–91. Note the qualifier: "its own violations." Municipal liability under *Monell* carries an important limitation: the statute does not incorporate the common-law doctrine of respondeat superior, so a municipality cannot be held liable for the constitutional torts of its employees and agents. *Id.*

Accordingly, to prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997). Specifically, the plaintiff must prove that the constitutional violation was caused by a governmental "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. We have interpreted this language to include three types of actions that can support municipal liability under § 1983: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (quotation marks omitted).

A *Monell* plaintiff must also prove that the policy or custom demonstrates municipal fault. *Brown*, 520 U.S. at 404. When a municipality takes action or directs an employee to take action that facially violates a federal right, municipal

fault is easily established. *Id.* at 404–05. In contrast, where (as here) the plaintiff alleges that the municipality has not directly violated his rights but rather has caused an employee to do so, a "rigorous standard[] of culpability … applie[s] to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. In this situation, the plaintiff must demonstrate that the municipality's action "was taken with 'deliberate indifference'" to the plaintiff's constitutional rights. *Id.* at 407. This is a high bar. Negligence or even gross negligence on the part of the municipality is not enough. *Id.* A plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences. *Id.*

Finally, a *Monell* plaintiff must prove that the municipality's action was the "moving force" behind the federal-rights violation. *Id.* at 404. Like the heightened showing of municipal fault, this rigorous causation standard guards against backsliding into respondeat superior liability. *Id.* at 405. To satisfy the standard, the plaintiff must show a "direct causal link" between the challenged municipal action and the violation of his constitutional rights. *Id.* at 404.

These requirements—policy or custom, municipal fault, and "moving force" causation—must be scrupulously applied in every case alleging municipal liability. As the Supreme Court has cautioned:

> Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did

not intend municipalities to be held liable un-
less *deliberate* action attributable to the munici-
pality directly caused a deprivation of federal
rights.

*Id.* at 415.

These principles are settled and familiar. So too is the re-
quirement that the plaintiff must initially prove that he was
deprived of a federal right. That's the first step in every
§ 1983 claim, including a claim against a municipality under
*Monell*. A *Monell* plaintiff must establish that he suffered a
deprivation of a federal right *before* municipal fault, deliber-
ate indifference, and causation come into play.

LaPorta's claim fails at this first step. He did not suffer a
deprivation of a right secured by the federal Constitution or
laws. It's undisputed that Kelly was not acting under color
of state law when he shot LaPorta. His actions were wholly
unconnected to his duties as a Chicago police officer. He was
off duty. He shot LaPorta after they spent a night out drink-
ing together and had returned to his home to continue
socializing at the end of the evening. Kelly's actions were
those of a private citizen in the course of a purely private
social interaction. This was, in short, an act of private vio-
lence.

LaPorta's claim is premised on the Fourteenth Amend-
ment right to due process—specifically, the due-process
liberty interest in bodily integrity. But he overlooks that the
Due Process Clause is a restraint upon *governmental* action:
"*No State shall* … deprive any person of life, liberty, or
property, without due process of law … ." U.S. CONST.
amend. XIV (emphasis added). And as the Supreme Court

explained more than three decades ago, the Clause does not impose a duty on the state to protect against injuries inflicted by private actors.

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*DeShaney*, 489 U.S. at 195.

*DeShaney* involved a due-process claim on behalf of a young boy who was abused by his father. *Id.* at 191. County social workers became aware of suspicious injuries and other signs of abuse but took no action to remove the child from his father's custody. *Id.* After the latest and most severe beating left the boy permanently disabled, the father was arrested and convicted of child abuse. The boy's mother then sued the county and the social workers under § 1983 alleging that they violated her son's right to due process. *Id.* at 193.

The Supreme Court rejected the claim, explaining that the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *Id.* at 196. The Court accordingly

held that the state does not have a due-process duty to protect against acts of private violence. *Id.* at 196–97. And "[b]ecause … the State had no constitutional duty to protect [the child] against his father's violence, its failure to do so—though calamitous in hindsight—simply does not constitute a violation of the Due Process Clause." *Id.* at 202.

The Court recognized two limited exceptions to this general rule. First, the state has an affirmative duty to provide for the safety of a person it has taken into its custody involuntarily. *Id.* at 199–200. This is often referred to as the "special relationship" exception. *See Buchanan-Moore*, 570 F.3d at 827. When a state takes a person into its custody and renders him involuntarily unable to care for himself, it has "a corresponding duty" to provide for his basic needs; a violation of this duty "transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney*, 489 U.S. at 200. The special-relationship exception did not apply in *DeShaney* for the obvious reason that the injured child was not in state custody. *Id*.

*DeShaney*'s second exception arises only by implication from a brief observation in the Court's opinion. The Court explained that although the county and its social workers "may have been aware" of the dangers the child faced in his father's home, they "played no part in the[] creation" of those dangers. *Id.* at 201. This language is generally understood as a second exception to *DeShaney*'s general rule, one that applies when the state "affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Doe v. Village of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) (quoting *Buchanan-Moore*, 570 F.3d at 827).

The *DeShaney* exception for state-created dangers is narrow. *Id.* at 917. A plaintiff must show that the state affirmatively placed him in a position of danger and that the state's failure to protect him from that danger was the proximate cause of his injury. *Buchanan-Moore*, 570 F.3d at 827. To satisfy the proximate-cause requirement, the state-created danger must entail a foreseeable type of risk to a foreseeable class of persons. *Id.* at 828. A generalized risk of indefinite duration and degree is insufficient. *Id.* at 828–29. Finally, because the right to protection against a state-created danger arises from the substantive component of the Due Process Clause, the state's failure to protect the plaintiff must shock the conscience. *Id.* at 827–28. "Only 'the most egregious official conduct' will satisfy this stringent inquiry." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Unless one of these limited exceptions applies, the state has no duty under the Due Process Clause to protect against private violence. *DeShaney* made that clear, and we have frequently applied its teaching. For example, in *Wilson v. Warren County*, 830 F.3d 464 (7th Cir. 2016), the plaintiffs sued a county and several of its officials alleging that they failed to prevent private persons from seizing their property. Citing *DeShaney*, we explained that the Due Process Clause "does not require a state to protect citizens from private acts unless the state itself creates the danger." *Id.* at 469. The exception for state-created dangers did not apply in *Wilson*, so we affirmed a summary judgment for the defendants. *Id.* at 470. Notably, we rejected the plaintiffs' *Monell* claim against the county because it had no constitutional duty to protect against the private wrongful conduct. *Id.*

*Latuszkin v. City of Chicago*, 250 F.3d 502 (7th Cir. 2001), involved a § 1983 claim arising out of a drunk-driving accident by an off-duty Chicago police officer. After attending a private party with other officers in a police-station parking lot, the intoxicated officer drove home in his own vehicle and on the way struck and killed a pedestrian. *Id.* at 503. The victim's husband filed a *Monell* claim against the City, but the district court dismissed it. *Id.* at 504. We affirmed, citing *DeShaney* and explaining that "[g]overnmental bodies … generally have no constitutional duty to protect individuals from the actions of private citizens." *Id.* at 505. Because the intoxicated officer "was acting as a private citizen, rather than as a police officer, when he killed [the pedestrian], none of her federally protected rights were violated." *Id.*

In *Wilson-Trattner v. Campbell*, 863 F.3d 589 (7th Cir. 2017), the plaintiff filed a § 1983 claim against a county sheriff and several of his deputies seeking damages for their failure to adequately protect her from her abusive ex-boyfriend, also a sheriff's deputy. She reported her ex-boyfriend's conduct to the sheriff's department, and the defendants simply advised her to seek a protective order. *Id.* at 592. Local police eventually arrested the ex-boyfriend after a particularly explosive episode at her home. The victim then sued the sheriff and his deputies in their individual and official capacities; she alleged that their inadequate response to her complaints caused her ex-boyfriend to continue abusing her with impunity. *Id.* at 593. Applying *DeShaney*, we held that the sheriff and his deputies had no constitutional duty to protect her from her ex-boyfriend's private acts of violence; we noted as well that the exception for state-created dangers did not apply. *Id.* at 593–96.

We could describe other examples, but it's enough for present purposes to say that we have repeatedly applied *DeShaney*'s holding that the state has no due-process duty to prevent harm from private actors unless one of the limited exceptions applies. *See, e.g., D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798–99 (7th Cir. 2015) (applying *DeShaney* to bar a claim that a school failed to protect the plaintiff from bullying); *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 815–17 (7th Cir. 2007) (applying *DeShaney* to bar a claim that a school failed to protect a student from a private attack while walking home); *Waubanascum v. Shawano County*, 416 F.3d 658, 665–71 (7th Cir. 2005) (applying *DeShaney* and rejecting a claim that a county violated a foster child's right to due process when the child was abused by a foster parent to whom the county had issued a "courtesy license" at the request of the child's county of residence); *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1019–23 (7th Cir. 2003) (applying *DeShaney* and holding that police officers who arrested the plaintiff and transported her to the hospital had no constitutional duty to protect her from a doctor's forcible collection of urine and blood samples for treatment purposes); *Hernandez v. City of Goshen*, 324 F.3d 535, 537–39 (7th Cir. 2003) (applying *DeShaney* to bar a claim that a police department caused a workplace shooting by failing to act on a reported threat); *Windle v. City of Marion*, 321 F.3d 658, 661–63 (7th Cir. 2003) (applying *DeShaney* and holding that police officers had no constitutional duty to protect the plaintiff from sexual abuse by her teacher).

This rule is not controversial. All circuits read *DeShaney* the same way. *See, e.g., Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019); *Estate of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491 (6th Cir. 2019); *Graves v. Lioi*,

930 F.3d 307, 319 (4th Cir. 2019); *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 248–49 (5th Cir. 2018); *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018); *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 241–42 (3d Cir. 2016); *Kruger v. Nebraska*, 820 F.3d 295, 302–03 (8th Cir. 2016); *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008); *Rivera v. Rhode Island*, 402 F.3d 27, 34–35 (1st Cir. 2005); *Butera v. District of Columbia*, 235 F.3d 637, 647–50 (D.C. Cir. 2001); *Wyke v. Polk Cnty. Sch. Bd.*, 129 F.3d 560, 566–67 (11th Cir. 1997).

LaPorta resists application of *DeShaney* by shifting the focus to the *Monell* framework for municipal liability. The judge agreed with this approach, reasoning that because the jury found that the City's policy failures "caused" Kelly to shoot LaPorta, *DeShaney* was inapplicable. Other judges in the Northern District of Illinois have issued similar rulings. *See Wagner v. Cook Cnty. Sheriff's Office*, 378 F. Supp. 3d 713, 714–15 (N.D. Ill. 2019); *Falcon v. City of Chicago*, No. 17 C 5991, 2018 WL 2716286, at *3–5 (N.D. Ill. June 6, 2018); *Cazares v. Frugoli*, No. 13 C 5626, 2017 WL 1196978, at *15 (N.D. Ill. Mar. 31, 2017); *Obrycka v. City of Chicago*, No. 07 C 2372, 2012 WL 601810, at *5–6 (N.D. Ill. Feb. 23, 2012).

These decisions reflect a basic misunderstanding of the relationship between *Monell* and *DeShaney*. *Monell* and *DeShaney* are not competing frameworks for liability. The two cases concern fundamentally distinct subjects. *Monell* interpreted § 1983 and addressed the issue of who can be sued under the statute; the Court held that a municipality is a "person" under § 1983 and may be liable—just like an individual public official—for its own violations of federal rights. 436 U.S. at 694. *Monell* did *not* address the substance of any right under the federal Constitution or laws. It has

nothing to say on that subject. It's a statutory-interpretation decision.

*DeShaney*, on the other hand, addressed the substance of the constitutional right to due process. 489 U.S. at 194–202. The Court interpreted the Due Process Clause and defined its scope, strictly limiting the circumstances under which a privately inflicted injury is cognizable as a due-process violation. LaPorta had the burden to prove a constitutional violation *in addition to* the requirements for municipal liability under *Monell*. The judge was wrong to brush *DeShaney* aside.[4]

Applying *DeShaney*, as we must, it's clear that the City is entitled to judgment as a matter of law. It had no due-process duty to protect LaPorta from Kelly's act of private violence. LaPorta has never argued that one of the *DeShaney* exceptions applies. Rightly so; he was not in state custody at the time of his injury, and no evidence supports the exception for state-created dangers. And because LaPorta was not deprived of his right to due process, the City cannot be held liable for his injuries under § 1983—and that is so *even if* the requirements of *Monell* are established. Simply put, LaPorta suffered a common-law injury, not a constitutional one.

As we've noted, the judge relied heavily on our decision in *Gibson*, both at summary judgment and in rejecting the

---

[4] The judge's view that *DeShaney* is inapplicable to *Monell* claims is particularly perplexing because *DeShaney* itself involved a *Monell* claim against the county and its social-services agency. The Supreme Court had no need to address *Monell* liability. Because the county and its social-services agency had no constitutional duty to protect the child from his father, there was no underlying violation of a federal right. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 n.10 (1989).

City's motion for judgment as a matter of law. *Gibson* involved a Chicago police officer who was found mentally unfit for duty and placed on medical leave. 910 F.2d at 1512. The Chicago Police Department prohibited him from carrying his gun or exercising any police authority; it also collected his star, shield, and identification card—but not his gun. *Id.* Months later the officer fatally shot his neighbor. *Id.* at 1513. The victim's estate filed suit under § 1983 against the City of Chicago and several police officers alleging Fourth Amendment and due-process violations. *Id.* The complaint included a *Monell* claim against the City premised on allegations that the police department failed to implement "adequate procedures to deal with the recovery of firearms and ammunition issued to police officers who had been placed on medical leave due to mental unfitness." *Id.*

The case came to us in an unusual procedural posture. The defendants moved to dismiss, arguing that the officer was not acting under color of state law at the time of the shooting. The judge denied the motion but limited discovery to the color-of-law issue. *Id.* at 1514. When the defendants later moved for summary judgment, the estate objected to consideration of anything other than whether the officer acted under color of state law. Because the judge had limited discovery to that issue alone, the estate had no opportunity to engage in discovery on other merits issues.

Without addressing the estate's procedural objection, the judge concluded that the officer did not act under color of state law, so the shooting victim had not been "seized" in violation of the Fourth Amendment. *Id.* at 1515. The judge also "considered and rejected the possibility that the City had a constitutional duty to protect the [victim]" as a matter

of due process. *Id.* (quotation marks omitted). Accordingly, the judge entered summary judgment for the defendants on all claims. *Id.*

We agreed that the undisputed evidence showed that the officer was not acting under color of state law at the time of the shooting. 910 F.2d at 1516–19. But we faulted the judge for considering and resolving other issues on summary judgment after strictly limiting discovery to that single topic. *Id.* at 1520. So we addressed the estate's claims as if we were reviewing a dismissal on the pleadings under Rule 12(b)(6) of the Federal Rules of Civil Procedure rather than a summary judgment. *Id.* Applying the Rule 12(b)(6) standard, we concluded that the estate's factual allegations about the City's deficient policies were sufficient to permit the *Monell* claim to proceed. *Id.* at 1520–21.

In a footnote we explained that our holding was "quite compatible with *DeShaney*":

> In *DeShaney*, the Supreme Court held that county authorities who had learned that a child was at risk of being abused by his father committed no constitutional violation by their failure to act to prevent the abuse. The Court reasoned that nothing in the due process clause requires the state to protect its citizens' life, liberty, and property "against invasion by *private* actors." [*DeShaney*, 489 U.S. at 195] (emphasis supplied). In determining that the county officials had not violated any constitutional right of the victim, the Court expressly noted that the state had "played no part in [the] creation [of the dangers faced by the victim], nor did it

> do anything to render him more vulnerable to
> them." *Id.* at [201]. It is in this important re-
> spect that the present case differs considerably
> from *DeShaney*. At this point in the litigation,
> where we are obliged to accept as true the
> plaintiff's factual allegations, the City is alleged
> to have played a part in both creating the dan-
> ger (by training and arming [the officer]) and
> rendering the public more vulnerable to the
> danger (by allowing [him] to retain his weapon
> and ammunition after it otherwise stripped
> him of his authority as a policeman).

*Id.* at 1521 n.19. In short, we held that the estate's factual allegations were sufficient to permit the *Monell* claim to proceed beyond the pleading stage under the *DeShaney* exception for state-created dangers.

This case is different. LaPorta never invoked the *DeShaney* exception for state-created dangers. He neither pleaded nor attempted to prove up a state-created danger, and the jury was not instructed on the legal elements of that type of due-process violation.

So the judge simply misapplied *Gibson*. We did *not* hold that a *Monell* claim is exempt from *DeShaney*'s general rule that the state has no constitutional duty to prevent acts of private violence. Nor could we. Nothing in *Gibson* suspend-ed the *DeShaney* rule for *Monell* plaintiffs.

The judge's misreading of *Gibson* led him to overlook a fundamental defect in LaPorta's *Monell* claim, both at sum-mary judgment and in rejecting the City's posttrial motion.

Under *DeShaney* the City had no due-process duty to protect LaPorta from Kelly's act of private violence.

LaPorta suggests that his novel theory against the City finds support in *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293 (7th Cir. 2010), but that case does not help him. *Thomas* involved a pretrial detainee who died in jail from pneumococcal meningitis. A jury cleared the individual defendants but found the sheriff's department liable for failing to adequately respond to Thomas's medical needs. *Id.* at 305. We concluded that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Id.* The verdicts in *Thomas* were easily reconcilable. The jury found that the sheriff's department was deliberately indifferent to the detainee's medical needs—a constitutional violation— because its policies for processing medical-request forms were clearly insufficient. That finding was not at all inconsistent with its exoneration of the individual officers. *Id.* Nothing in our decision in *Thomas* lifted the plaintiff's burden to prove a predicate constitutional violation. To the contrary, because pretrial detainees have a constitutional right to medical care while in custody, the sheriff's department could be found liable for violating that right even though the individual defendants were not. *Id.* at 301 & n.2.

LaPorta also relies on *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017) (en banc), but that case too is distinguishable. There, a state prisoner died from acute renal failure. We concluded that a jury could find that the prison's failure to enact a coordinated-care policy for prisoners with chronic illnesses amounted to deliberate indifference to the high likelihood that prisoners would die.

*Id.* at 382. It did not matter that no individual medical provider could be found liable; the problem was that "no one was responsible for coordinating [Glisson's] overall care." *Id.* at 375. Again, nothing in our decision in *Glisson* removed the plaintiff's burden to prove an underlying constitutional violation. The case involved the prisoner's Eighth Amendment right to adequate medical care. *Id.* at 378; *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

This case is fundamentally different. Here there was no constitutional violation because the City had no due-process duty to protect LaPorta from Kelly's private violence.

### III. Conclusion

LaPorta's case is tragic. His injuries are among the gravest imaginable. His life will never be the same. But § 1983 imposes liability only when a municipality has violated a federal right. Because none of LaPorta's federal rights were violated, the verdict against the City of Chicago cannot stand. We REVERSE and REMAND for entry of judgment for the City.