**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 21, 2022
Decided July 18, 2022[1]

**Before**

DAVID F. HAMILTON, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 21-1958

| | |
|---|---|
| DEISY JAIMES, *et al.*,<br>    *Plaintiffs-Appellants*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 17-CV-8291 |
| COOK COUNTY, *et al.*,<br>    *Defendants-Appellees*. | Jorge L. Alonso,<br>*Judge*. |

**O R D E R**

Using a gun purchased as a requirement for her job, former Cook County Sheriff's Office ("CCSO") correctional officer Erika Aguirre shot and injured her ex-fiancée, Deisy Jaimes, and Deisy's father, Enrique, before fatally shooting herself. The

---

[1] Circuit Judge Kanne died on June 16, 2022, and did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel, with deep gratitude to Judge Kanne and his staff for their work on this case.

Jaimes family sued various Cook County officials, seeking to hold the CCSO liable for Aguirre's actions on both federal and state grounds. Plaintiffs have appealed the district court's grant of summary judgment as to their due process claim challenging the official CCSO policy that requires all correctional officers to own a firearm, as well as the district court's decision declining to exercise supplemental jurisdiction over the state claims. We affirm as to the federal claim and remand the case to the district court to consider supplemental jurisdiction over the state claims.

## I

Erika Aguirre was a correctional officer for the CCSO. She and Plaintiff Deisy Jaimes had been in a relationship since 2011. They eventually moved in together and got engaged. By 2013, however, their relationship had deteriorated. For example, in one incident, Aguirre threatened to kill Deisy and claimed she could get away with it because she was a correctional officer. In 2015, the two broke up, and Deisy moved back into her family home.

On November 15, 2015, after her shift at the Cook County jail, Aguirre learned that Deisy was seen in public with another woman. Aguirre then dressed in all black, including a black ski mask, broke into the house where Deisy lived with her family, and started shooting with a gun purchased as a requirement for her job. Aguirre found Deisy's basement bedroom and shot her in the head, eye, arms, and leg. Deisy's father Enrique began coming down the stairs, and Aguirre fired shots at him, too, hitting him in the head and torso. Aguirre then shot and killed herself. Deisy and Enrique survived the shooting but suffered catastrophic injuries. According to Plaintiffs, Deisy has disabling brain damage, vision loss, permanent disfigurement to her face, and paralysis on her left side, while Enrique is confined to a wheelchair for the rest of his life. Both Deisy and Enrique need substantial daily assistance, which is provided by Gloria Jaimes, Deisy's mother and Enrique's wife.

Aguirre purchased the gun she used for the shooting, a 9mm Glock 19 semiautomatic handgun, pursuant to an official CCSO policy that requires all its correctional officers to purchase a firearm. Before she bought the weapon, Aguirre had never owned a gun or expressed interest in owning one. The CCSO provides correctional officers like Aguirre with funds that can be used to buy their service weapons. By virtue of her CCSO credentials, Aguirre was authorized to carry her weapon while off duty (in other words, she was exempted from having to separately obtain a concealed carry license). At the time of the shooting, however, Aguirre was assigned to the jail's Receiving, Trust and Classification Division, a post that did not require her to carry a firearm. Indeed, correctional officers are prohibited from bringing weapons into the jail.

The CCSO offers at least two justifications for its policy of requiring correctional officers to purchase a firearm: (1) a correctional officer may be assigned to a post that requires a firearm, and (2) under Illinois law, correctional officers must meet certain firearm qualification and training requirements, including forty hours of firearms training each year. Although some other corrections facilities permit their correctional officers to borrow firearms or use department-issued firearms to complete the requisite firearms training, the CCSO requires each of its correctional officers to own a firearm instead. Some CCSO correctional officers also testified that they believe the purpose of the firearm policy was to enable correctional officers to protect themselves from former detainees or gang members they may encounter while off duty.

CCSO correctional officers must undergo an initial firearm qualification and annual requalification, although this process does not include any psychological component aimed at assessing whether the correctional officer is mentally fit to carry a firearm. As recruits, however, all correctional officers attend sixteen weeks of pre-service training covering a variety of topics, including proper use of firearms, coping skills, and domestic violence. Additionally, the CCSO hiring process includes a "personality exam" that comprises several psychological tests, as well as a background check. After hiring, the CCSO conducts routine background checks of its correctional officers.

At summary judgment, Plaintiffs presented expert testimony indicating that it is well known in the corrections field that correctional officers deal with elevated levels of stress that can, among other things, increase tension in their domestic relationships. The experts also cited two prior incidents that involved a CCSO correctional officer shooting a spouse while off duty. Plaintiffs also presented the testimony of a psychology expert, who explained that having a firearm in the home increases the likelihood of domestic violence and homicide.

The CCSO operates three programs relevant to the issues raised by the parties. First, the Peer Support Program is a network of volunteer CCSO employees who provide confidential support to CCSO employees experiencing personal and professional crises. Second, the Employee Assistance Program provides confidential counseling services by staff who are professionally certified in psychology and social work. Participation in both programs is voluntary. Correctional officers are given information about the programs and can be referred to the programs by other CCSO employees or concerned family members.

Finally, the CCSO operates an Early Warning System, the purpose of which is to ensure compliance with the CCSO's use-of-force directives by flagging employees involved in a higher than usual number of use-of-force incidents at the jail and, when appropriate, providing assistance or intervention. Aguirre was flagged by the Early

Warning System in June 2015, but CCSO supervisors found that she did not use excessive force in any of the underlying incidents. A supervisor also gave Aguirre information about the Employee Assistance Program but did not ask her about any stressors she may have been facing at work or in her personal life. According to Plaintiffs, Aguirre exhibited bizarre and paranoid behavior in the months leading up to the shooting.

Deisy, Enrique, and Gloria Jaimes sued various Cook County defendants for the injuries inflicted by Aguirre. They filed their original complaint on November 14, 2016, in the Circuit Court of Cook County, Illinois. Plaintiffs then voluntarily dismissed their complaint and refiled it in federal district court on November 15, 2017.

Plaintiffs asserted a number of claims under 42 U.S.C. § 1983 against Cook County officials in their individual and official capacities, as well as state law claims against Sheriff Thomas Dart in his official capacity for negligent hiring, training, and supervising; willful and wanton conduct; and loss of consortium. The district court granted summary judgment to Defendants on the federal claims and declined to exercise supplemental jurisdiction over Plaintiffs' state claims. Plaintiffs appealed.

## II

### A. Due Process Claim

Of their federal claims, Plaintiffs discuss only their due process claim against Sheriff Dart in his official capacity, which is, in essence, a claim against Cook County and the CCSO. Because § 1983 does not permit a municipality to be held liable for the actions of its employee under a theory of *respondeat superior*, Plaintiffs must instead prove that the CCSO had a policy or custom that caused the constitutional violation. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). To prevail on a so-called *Monell* claim, Plaintiffs must show that the CCSO "took 'deliberate' action that was the 'moving force' behind a constitutional injury." *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–07 (1997)).

Of course, Plaintiffs must demonstrate that they suffered a constitutional injury in the first place. *See First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). They have not done so. The Due Process Clause provides that "[n]o *State* shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 2 (emphasis added). In other words, "the Clause does not impose a duty on the state to protect against injuries inflicted by private actors." *LaPorta*, 988 F.3d at 987. Plaintiffs' injuries were inflicted by Aguirre, a private actor, while she was off duty.

While the Due Process Clause traditionally has not been interpreted as requiring the government to protect individuals from injuries inflicted by private actors like

Aguirre, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989), courts have read *DeShaney* as carving out two exceptions in which the state can be held liable for private violence. One of these is the "state-created danger" exception, under which the government violates an individual's due process rights when it affirmatively creates a danger that injures the individual. *LaPorta*, 988 F.3d at 988.

To succeed under the state-created danger theory, Plaintiffs must show: (1) that the CCSO, by its affirmative acts, created or increased a danger that Plaintiffs faced; (2) that the CCSO's failure to protect Plaintiffs from the danger was the proximate cause of their injuries; and (3) that the CCSO's conduct "shocks the conscience." *See Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019). We have stressed that liability under the state-created danger theory has only been found under "rare and often egregious" circumstances. *Doe v. Village of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015).

Plaintiffs' state-created danger claim fails on the third element. A policy is arbitrary in the constitutional sense—*i.e.*, it shocks the conscience—when it evinces deliberate indifference to a known, serious risk and policymakers fail "to avert the risk though it could easily have been averted." *Slade v. Bd. of Sch. Dirs.*, 702 F.3d 1027, 1029 (7th Cir. 2012). Plaintiffs maintain that the CCSO knew of the risk of domestic violence and failed to take steps that could have averted this danger.

But, as the district court pointed out, the CCSO implemented various measures to support and monitor correctional officers' mental health and trained them in using firearms. Correctional officers participate in sixteen weeks of pre-service training covering the proper use of firearms, coping skills, and domestic violence; complete an annual firearms qualification; and undergo a personality exam as part of the hiring process as well as routine background checks. The CCSO also runs the Peer Support Program and Employee Assistance Program to help officers who are experiencing mental health problems. Although the Early Warning System did flag Aguirre for being involved in a higher than usual number of use-of-force incidents at the jail, the CCSO found that she did not use excessive force in any of the incidents.

Plaintiffs focus on what the CCSO did *not* do to prevent incidents like this one. According to Plaintiffs, the CCSO maintained an irrational policy of arming correctional officers at home, even though they are prohibited from carrying a firearm at the jail, and it sent them into a work environment that is known to cause elevated stress levels, without sufficient measures to support and monitor officers' mental health. For example, the CCSO does not inquire into correctional officers' mental health when they are flagged by the Early Warning System. And a correctional officer who has become mentally unstable will not receive treatment through either the Peer Support Program or the Employee Assistance Program unless she affirmatively requests it. Plaintiffs assert that "reasonable jurors could conclude that these trainings and programs either

have no relevance to the type of danger Plaintiffs faced or were so inadequate that they are themselves evidence of deliberate indifference."

That the CCSO could have done more, however, does not mean that it acted with deliberate indifference. *See Slade*, 702 F.3d at 1029. While a better policy may have been not to arm correctional officers at all, "actions … [that are] short-sighted, flawed, negligent, and tortious … do not satisfy the standard for finding a constitutional violation." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 656 (7th Cir. 2011) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998)). A standard of deliberate indifference cannot mean that the government has a duty to prevent all constitutional injuries in practice. The CCSO clearly took steps to identify and mitigate the risk of violence, precluding a finding of deliberate indifference.

We do not wish to minimize the tragic consequences of Aguirre's actions. But that is the point—they were Aguirre's actions, not the CCSO's, and the CCSO cannot be held constitutionally liable in these circumstances.

### B. State Claims

After granting summary judgment to Defendants on the federal claims, the district court declined to exercise supplemental jurisdiction over the state law claims, dismissing them without prejudice under 28 U.S.C. § 1367(c). Although in most cases the district court should presumptively relinquish jurisdiction over the state law claims when the accompanying federal claims drop out before trial, exceptions exist. See, e.g., *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007) (exception applies "where the statute of limitations would bar the refiling of the supplemental claims in state court"). Here, the parties do not dispute that the statute of limitations has run on Plaintiffs' state law claims. But there is nothing in the record to show that the court considered this at summary judgment (although the court and the parties were aware of its existence) before dismissing the state law claims. See *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (the district court "should consider and weigh the factors of judicial economy, convenience, fairness and comity" to determine whether such exception applies); *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (these factors should be weighed "at every stage of the litigation"). So we remand to provide the district court the opportunity to consider this argument and decide whether to exercise supplemental jurisdiction under the particular circumstances of this case. See *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

### III

For these reasons, we AFFIRM the district court's judgment with respect to Plaintiffs' federal claims, VACATE the dismissal of their state claims, and REMAND the case to the district court for further proceedings consistent with this opinion.