In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 22-2022

MICHELLE GIESE,

*Plaintiff-Appellant,*

*v.*

CITY OF KANKAKEE, DAMON SCHULDT,
and NATHAN BOYCE,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 19-cv-1245 — **Colin S. Bruce**, *Judge.*

_____

ARGUED MAY 24, 2023 — DECIDED JUNE 15, 2023

_____

Before SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges.*

ST. EVE, *Circuit Judge.* On October 18, 2018, Michelle Giese—a lieutenant in the Kankakee Fire Department ("KFD")—was attacked by another firefighter while responding to a fire at a senior living facility. The City suspended the other firefighter for twenty-four hours without pay, ordered him to complete an anger management course, and directed him to avoid working on the same shift as Giese for three

months. Giese experienced ongoing physical and mental in-
juries from the incident, causing her to take leave from work
and apply for workers' compensation. She returned to work
six months later but permanently left her position shortly af-
ter. She then filed this lawsuit, alleging that the defendants,
among other things, retaliated against her for certain pro-
tected activities under Title VII and condoned aggressive and
inappropriate behaviors as part of a "code of silence" that re-
sulted in her attack. The district court granted summary judg-
ment for the defendants, and this appeal followed.

## I. Background

On October 18, 2018, Michelle Giese and several other fire-
fighters, including Lieutenant Nathan Boyce, responded to a
call on the second floor of a senior living facility. Boyce took
command of operations, while Giese and another firefighter
brought a fire hose up the stairs. Boyce claims that he ordered
the firefighters to wait until the hose was "charged," or filled
with water, to proceed through the fire doors into the second-
floor main hallway, but Giese testified that she did not hear
the order.

While Boyce was "flaking out" or unkinking the fire hose
so that it could be charged, Giese and several other firefighters
used thermal imagining technology to evaluate the conditions
behind the fire doors. They determined that the fire was con-
tained in one of the units behind the fire doors and therefore
decided to proceed down the hallway with the uncharged fire
hose. After the firefighters heard moans from inside an apart-
ment, they dropped the hose and entered the apartment to as-
sist an elderly woman who had caught on fire.

Boyce realized that Giese and the others had continued into the hallway in violation of his orders and followed them. Once he reached the entryway of the apartment, Boyce grabbed Giese by the harness and pushed her into the wall—lifting her so high that her feet were off the ground. After Giese slid down the wall and regained her footing, Boyce pushed her against the wall two more times, each time pulling her back with her harness before pushing her into the wall again. During the incident, which lasted about a minute to a minute-and-a-half, the two moved through the apartment from the entryway into an internal hallway, where Boyce pushed Giese three more times.

Giese informed her supervisors of the incident, and over the following week, Chief Damon Schuldt met with Giese twice. Schuldt informed her that he would not take the matter lightly and that Boyce would be disciplined, and he instructed her to change her work schedule so that she and Boyce would not be on the same shift. Schuldt ultimately suspended Boyce for twenty-four hours without pay and required him to complete an anger management course. Schuldt further directed Boyce not to work on the same shifts as Giese for three months and instructed that any additional violations of department rules could lead to further discipline, including termination. Some firefighters and union members later testified that they believed this punishment to be relatively light, and Giese contends that Schuldt imposed a short suspension because the Police and Fire Commission must approve suspensions of more than forty-eight hours.

On November 5, Giese contacted Elizabeth Kubal, the head of human resources for the City. Giese explained her frustration that she had been asked to work around Boyce's

schedule and that she had not been formally interviewed regarding the incident. About ten minutes after Giese ended the call, Schuldt called Giese, demanding to know why she had contacted human resources. He reiterated his order that she amend her schedule to avoid working with Boyce.

As a result of the incident, Giese experienced ongoing psychological and physical trauma in the form of decreased ability to focus, panic attacks, nausea, vomiting, and diarrhea and had to use personal sick time to take off work. On November 15, she put in a workers' compensation request to cover those injuries. That request was granted, and the sick time she had previously used was credited back to her.

On March 13, 2019, Giese visited the firehouse. Captain Michael Casagrande informed Giese that Schuldt had instructed the supervisors not to speak with her because she had retained an attorney and there was a pending lawsuit. This was false; there was no pending lawsuit at the time. Nonetheless, Schuldt contends that James Ellexson (the new head of human resources for the City) instructed him not to communicate directly with Giese and instead to leave such communication to Ellexson.

On April 5, Giese filed a complaint with the Equal Employment Opportunities Commission ("EEOC") alleging harassment and sex discrimination. A week later, Ellexson called Giese to discuss her return to work. According to Giese, Ellexson informed her that if she did not report to work by April 15, she would be terminated.

Giese began working again on April 14. She was assigned to light duty, which included tasks such as cooking, cleaning, and clerical work. Apparently, no one informed Casagrande

that Giese was assigned to light duty because, on her first day back, Casagrande asked her to assist in an active fire investigation. Giese told Casagrande that she was assigned to light duty and therefore could not conduct the investigation. Casagrande did not insist or require her to complete the fire investigation or any task she was restricted from doing.

Giese continued to work light duty until May 10, when they sent her home because she broke out in hives and blisters and had an elevated blood pressure. She has not returned to work since and applied for a disability pension in November 2019. Her application was still pending as of March 2023.

Giese sued the City, Schuldt, and Boyce, bringing sixteen claims under federal and state law. The district court granted summary judgment to the defendants on all federal claims and declined to exercise supplemental jurisdiction over the remaining state law claims. With respect to her Fourth Amendment *Monell* claim, the district court found that Giese "has introduced no evidence that would allow a rational jury to conclude that she suffered a deprivation of her rights under … [the] Fourth Amendment." With respect to her Title VII retaliation claim, the district court found that the only protected activity in this case was the filing of Giese's EEOC complaint and the defendants did not engage in any adverse employment actions after that point.

Giese timely appealed the district court's decision with respect to her Fourth Amendment *Monell* and Title VII retaliation claims, which apply only to the City and Schuldt.[1] She

---

[1] The only claims alleged against Boyce were state law claims, which are not on appeal.

expressly abandoned her sex discrimination claims under Title VII and the Equal Protection Clause in her opening appellate brief.

## II. Analysis

### A. Fourth Amendment *Monell* Claim

"[T]o prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself." *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Where the municipality has not directly violated the plaintiff's rights and instead caused an employee to do so, the plaintiff must demonstrate that the municipality acted with deliberate indifference to the plaintiff's constitutional rights. *Id.* at 987. Additionally, the plaintiff must prove that the municipality's action was the "moving force" behind the plaintiff's violation. *Id.*

Giese claims that Boyce's conduct constituted an unlawful seizure in violation of the Fourth Amendment. U.S. Const., amend. IV. She further contends that the City and Schuldt had a practice of overlooking the misconduct of firefighters that allowed her constitutional rights to be violated.[2] Specifically,

---

[2] A plaintiff can also prevail on a *Monell* claim by showing "an express policy that causes a constitutional deprivation when enforced … [and] an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* at 986. Contrary to her counsel's contention at oral argument, however, Giese provides no evidence that there was an official City policy that resulted in the attack. Nor does she dispute the defendants' contention that the Board of Police and Fire Commissioners, not the defendants, are the final policymakers for KFD. Her *Monell* claim,

she maintains that the defendants, despite knowing of the risk of aggression and violent behavior within KFD, cultivated a "code of silence" that allowed and emboldened Boyce to violate Giese's Fourth Amendment rights.

As a threshold matter, the defendants argue that Giese did not sufficiently develop her Fourth Amendment claim in the district court and thus waived her argument. We disagree. Giese's argument was the same below as it is now: the defendants knew about and actively ignored Boyce's inappropriate behavioral issues, resulting in his unreasonable seizure of her. She made clear in her summary judgment briefing that her claim related to Boyce's violent behavior. She stated, "City policymakers' decision not to adopt policies to respond to substance abuse, assault and battery, and misconduct among its firefighters renders the City liable." She clarified that even if "Boyce [had] not singled her out for her gender, that cause of action would remain." This was sufficient to preserve her claim for appeal.

On the merits, Giese's claim fails because none of her evidence, separately or taken together, creates a genuine dispute regarding whether the defendants had a practice of condoning aggressive behavior, resulting in a constitutional injury. Although we have previously recognized that a defendant's "code of silence" can give rise to a valid *Monell* claim, such a claim requires more than evidence of "individual misconduct by … officers"; it requires "a *widespread practice* that permeates a critical mass of an institutional body." *Rossi v. City of*

---

therefore, hinges on showing that the defendants had a practice that was the "moving force" behind her constitutional violation.

*Chicago*, 790 F.3d 729, 737 (7th Cir. 2015); *see also Sledd v. Lindsay*, 102 F.3d 282, 289 (7th Cir. 1996).

Giese fails to provide such evidence. The undisputed facts in the record indicate that Boyce's actions were unprecedented. Prior to the incident, no KFD firefighter had ever been violent against another firefighter while on duty, and the record does not suggest that anyone had anger or drinking problems at work. By itself, Giese's anecdotal evidence does not "establish a tie between [Boyce's actions] and the … department as a whole." *Rossi*, 790 F.3d at 738.

Giese cites *Estate of McIntosh by Lane v. City of Chicago*, No. 15-cv-1920, 2022 WL 4448737 (N.D. Ill. Sept. 23, 2022), for support, but that case is both nonprecedential and inapplicable here. In that case, the plaintiff relied upon data spanning the entire city department, whereas here, Giese's evidence is almost exclusively anecdotal evidence of Boyce's past behaviors. She does not provide any department-wide studies or statistics that demonstrate such behavior was so widespread that the department's failure to address it suggested the existence of a code of silence.

Lastly, the record does not support Giese's contention that there was such a high risk of constitutional injury from Boyce that the "single incident" theory of municipal liability applies here. *See Connick v. Thompson*, 563 U.S. 51, 63 (2011) (describing the "narrow range of circumstances" in which "a pattern of similar violations might not be necessary to show deliberate indifference") (citation omitted). In such cases, the "risk of constitutional violations [is] so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior

constitutional violation." *J.K.J. v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020). "Qualifying circumstances under this doctrine are rare"; "[a] constitutional violation must be a 'blatantly obvious' consequence of inaction for single-incident liability" to apply. *Orozco v. Dart*, 64 F.4th 806, 825–26 (7th Cir. 2023).

Giese falls far short of meeting this demanding standard. Although her evidence may show that Boyce had a bad temper, a drinking problem, and poor judgment, no reasonable jury could find that there was such a high risk that Boyce would act aggressively towards a fellow firefighter at work that the defendants' failure to address that risk constituted deliberate indifference. Witnesses testified that Boyce sometimes acted aggressively when drunk at non-work, social events and that he occasionally yelled or became angry at work, but no one had ever seen him threaten or lay hands on anyone at work. Nor is there any evidence in the record that anyone had ever reported that they felt unsafe working with Boyce. In fact, Giese and other firefighters stated that they were shocked by Boyce's actions because they had not expected him to act that way. For these reasons, the district court properly granted summary judgment on Giese's *Monell* claim.[3]

## B. Title VII Retaliation Claim

"To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) [she] engaged in an activity protected by the statute; (2) [she] suffered an adverse employment action;

---

[3] Because the municipal defendants cannot be held liable under a *Monell* theory, we need not discuss whether a reasonable jury could find an underlying Fourth Amendment violation.

and (3) there is a causal link between the protected activity and the adverse action." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). For a retaliation claim, an adverse employment action is that which would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The plaintiff must show that the employer took the adverse employment action because of the protected activity. *Lewis*, 909 F.3d at 866.

It is undisputed that Giese's filing of her April 5, 2019 EEOC complaint constitutes protected activity under Title VII. She further contends that she engaged in two other protected activities before she filed that complaint: (1) she filed a workers' compensation claim on November 15, 2018, and (2) she complained to the head of human resources in early November 2018. Neither our case law nor the record supports her contention.

Although we have never expressly addressed whether a workers' compensation claim is protected under Title VII, other circuits have concluded that it is not. *See, e.g.*, *Lanza v. Postmaster General of U.S.*, 570 F. App'x 236, 241 (3d Cir. 2014); *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012); *Jimenez v. Potter*, 211 F. App'x 289, 290 (5th Cir. 2006); *Primm v. Dep't of Hum. Servs.*, No. 16-6837, 2017 WL 10646487, at *3 (6th Cir. Aug. 17, 2017); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093 n.8 (9th Cir. 2008). We follow the lead of our sister circuits in holding that filing a workers' compensation claim alone is typically not protected activity under Title VII. Title VII prohibits discrimination on the basis of race, color, gender, national origin, age, or religion. In most cases, like here, the work-related injuries at issue in a workers' compensation

claim will not relate to the claimant's protected characteristics. Where that is the case, the filing of a workers' compensation claim cannot be the basis of a Title VII retaliation claim.

In contrast, the parties do not dispute that complaining to human resources about sex discrimination is protected activity. *See Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012); *Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014). But that is not what happened here. In her deposition, Giese explained that, on November 5, she "advised [human resources] of the incident that had occurred and … [said she] wasn't getting anywhere with the fire chief." Giese complained that she had been directed "to amend [her] schedule to work around" Boyce and that she "had not been interviewed by the fire chief or chiefs and the union board yet." Although we must make all inferences in favor of Giese on summary judgment, nothing in the record suggests that Giese informed human resources that she believed she was being discriminated against *on the basis of her sex*. Without a link between the employer's actions and the plaintiff's protected class, this conversation cannot constitute protected activity under Title VII. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class."). For these reasons, the only protected activity on which Giese can base her retaliation claim is the filing of her EEOC complaint.

To prevail on a Title VII retaliation claim, the plaintiff cannot merely show that she engaged in protected activity; she must also show that the defendants retaliated against her for

that activity. Although Giese provides a long list of alleged adverse employment actions to support her retaliation claim, we need only address those that occurred after April 5, 2019, the date she filed her EEOC complaint. As the district court thoughtfully explained, "[i]t is axiomatic that an employer cannot 'retaliate' against an employee for conduct in which the employee has not yet engaged." *See also Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 933 (7th Cir. 2017) ("The problem with Nischan's claim, however, is that Nischan lodged no complaint until *after* Stratosphere removed her from the lot.").

Giese points to only three actions occurring after April 5: (1) the defendants' requirement that she return to work against medical advice; (2) their threat to fire her if she did not return to work by April 15; and (3) their failure to tell Casagrande about her light work assignment. None of these assertions satisfy the adverse employment action element on this record.

First, the record does not support Giese's contention that she was required to return to work against medical advice. The workers' compensation provider required that Giese be evaluated by a psychologist for a possible return to work, but Giese relies entirely on the opinion of her personal therapist. In contrast, the two psychologists who evaluated Giese concluded that she was capable of doing light work. The first psychologist, who had been referred to Giese by her personal therapist, concluded that Giese was "capable of working so long as it did not involve any life or death decision-making." Further, Giese admitted in her deposition that, at the time of the evaluation, she agreed that she could engage in light work. The second psychologist similarly concluded that Giese

could return to work with some light duty arrangement. Considering the whole record, no reasonable jury could find that the defendants forced Giese to return to work as retaliation. The only reasonable inference from the medical evidence in this case is that the defendants required Giese to return to work for light duty because they believed her physically and mentally able to do so.

Second, although Giese contends that Ellexson told her that they would terminate her if she did not return to work by April 15, there is no evidence in the record supporting this contention. Giese did not testify in her deposition that Ellexson made this threat and cites only her complaint allegation in her statement of undisputed facts.[4] *See Burrell v. City of Mattoon*, 378 F.3d 642, 648 (7th Cir. 2004) ("[M]ere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment.").

Third, although the defendants did not tell Casagrande of her light work assignment, Giese concedes that she was never required to perform tasks that she was not authorized to perform. She admitted in her deposition that Casagrande did not "insist that [she] do things that [she was] restricted from doing"; that "neither Captain LaRoche or Captain Casagrande insist[ed] that [she] go ahead and do the[] [investigation] even though [she] said [she] didn't think it was a good idea"; and that there was no "time during her light duty where [she was] … ordered or required to do [a] task" she could not do. These statements belie her arguments on appeal.

---

[4] At oral argument, Giese's counsel was unable to point the Court to any specific evidence, stating only that—if such evidence did, in fact, exist—it would be in Giese's deposition.

### III. Conclusion

We are sympathetic to Giese, who continues to suffer mental and physical injuries from an attack that should never have occurred. But Giese's remedy, if any, is not in federal court. For the foregoing reasons, Giese fails to create a genuine dispute of material fact precluding summary judgment regarding her Fourth Amendment *Monell* claim and her Title VII retaliation claim. The district court, therefore, properly granted summary judgment to the defendants.

AFFIRMED