In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-1816

AMANDA RAKES, Administrator of the Estate of Amylyn
Slaymaker and Next Friend to the minor children G.C. and
M.C.,

*Plaintiff-Appellant*,

*v.*

JONATHAN P. ROEDERER and ESTATE OF TE'JUAN JOHNSON,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:21-cv-00114 — **Jane Magnus-Stinson**, *Judge*.

_____

ARGUED JANUARY 18, 2024 — DECIDED SEPTEMBER 25, 2024

_____

Before RIPPLE, BRENNAN, and SCUDDER, *Circuit Judges*.

PER CURIAM. On the night of July 18, 2019 in Charlestown,
Indiana, bystanders called 911 to report that a man, RJ
Slaymaker (RJ), and a woman, Amylyn Slaymaker (Amylyn),
were fighting in the middle of a residential street. Two police
officers responded to the call and separated RJ and Amylyn.
Amylyn told the officers that RJ (her husband) was drunk,

had hit her, had guns on him and at their house, and was threatening to kill her and himself. RJ denied hitting her or making any threats. The officers called an ambulance for RJ so he could get help with mental health issues at a nearby hospital. After RJ left in the ambulance, the officers allegedly told Amylyn that RJ would be kept at the hospital under a 24-hour mental health hold.

But if they did say that to Amylyn, it was not true: neither the officers nor anyone else placed RJ under a hold. Instead, the officers merely encouraged him to seek help voluntarily. RJ left the hospital shortly after arriving and returned to the house that he shared with Amylyn. There, he shot and killed Amylyn, then himself.

The administrator of Amylyn's estate subsequently brought this action against Officer Roederer and the estate of Officer Johnson (who died shortly before this litigation). She primarily relies on the state-created danger doctrine, under which state officials can in limited circumstances be held liable under section 1983 for recklessly placing plaintiffs at risk of harm from third parties. The district court concluded that the defendants were entitled to qualified immunity and granted summary judgment on that basis.

We now affirm the judgment of the district court insofar as it relates to Officer Roederer. He may recover his costs related to this appeal. We reverse the judgment of the district court and remand for further proceedings insofar as it relates to Officer Johnson. His estate may recover its costs on this appeal.

Each judge of the panel has filed a separate opinion setting forth his view on the appropriate disposition of this appeal.

Judge Ripple would reverse the judgment of the district court with respect to both defendants and remand for further proceedings. Judge Scudder would reverse the judgment and remand for further proceedings with respect to the estate of Officer Johnson. He would affirm the judgment with respect to respect to Officer Roederer. Judge Brennan would affirm the judgment of the district court with respect to both defendants. The opinion of each judge is set forth below.

RIPPLE, *Circuit Judge*.

At the time of their deaths, RJ and Amylyn Slaymaker had been married for about seven years. The allegations of abuse during that period are startling. He shot at her on multiple occasions, and he once set fire to their couches in an attempt to burn down their house. He also often "dared" her to engage in sexual acts with other men and threatened to hurt her if she did not complete the "dares." Examples of these threats included "I'll break your fucking jaw [if] you walk in my fucking house without completeing [*sic*] my dare"[1] and "Come home and not complete shit, you will be in the hospital."[2] Whenever Amylyn suggested divorce, RJ threatened suicide. If she called the police, RJ said he would commit "suicide by cop."[3]

On the night in question, RJ completely lost control. He had a few drinks, then a few more drinks. At around 11 p.m., he texted Amylyn to say that, because she had not completed one of his "dares," he was going to "gun [d]own" Eric,

---

[1] R.67-21 at 7.

[2] *Id.*

[3] R.67-3 at 20:53-58; R.67-4 at 22.

Amylyn's ex-husband and the father of her two children.[4] Eric was watching the children at his house that night. RJ taunted Amylyn: "Watch [m]e on gps. … Heading to your kids house."[5] He told her to "[g]ive it 10 mins and call the cops."[6] It would be a "[r]eal suicide crime scene," he predicted.[7] Amylyn barely beat RJ to Eric's house, stopping him right in front of Eric's driveway. RJ said to her, "Do you want me to shoot you? And then the kids come out in the morning to see their mother dead?"[8] The two of them got into a physical altercation in the street.

One of Eric's neighbors saw them fighting and called 911. The neighbor told dispatchers that he and his wife saw a man hitting a woman on the street near his house and that the man may have had a gun. Charlestown Police Department Officers Te'Juan Johnson and Jonathan Roederer responded to the call. The officers drove to the scene separately, and video cameras mounted on the dashboards of their cars captured much of what followed. When the officers arrived, Amylyn told them that RJ was drunk and armed and that she was "scared for [her] life."[9] The officers handcuffed RJ, confiscated his gun, and separated the spouses.

The officers endeavored to find out what had happened. Officer Johnson spoke with Amylyn. She showed him the

---

[4] R.82-4 at 1.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] R.67-4 at 14.

[9] R.67-3 at 1:33-35; R.67-4 at 4–5.

texts RJ had sent her and told him that, during the fight in the street, RJ had punched her and hit her with the front sight of his gun. She also told him about RJ's other threatening behavior and that he had two AR-15s at their house. Officer Roederer spoke with RJ and the neighbors. RJ denied hitting Amylyn and said he was having a hard time with PTSD he developed in military service. The neighbors admitted uncertainty about whether they had actually seen RJ hit her.

At one point, Amylyn asked Officer Johnson if the officers could remove RJ's AR-15s from her house. Officer Johnson relayed the request to Officer Roederer and suggested that Officer Roederer drive RJ back to the house and remove the AR-15s. Officer Roederer expressed hesitation:

| | |
|---|---|
| OFFICER ROEDERER: | You want me to get the guns from his house? |
| OFFICER JOHNSON: | Yeah, the two AR-15s, yeah. |
| | … |
| OFFICER ROEDERER: | I mean, should I keep him in cuffs until I get the guns? I'm not -- I mean, I don't want to walk inside --[10] |

In his deposition, Officer Roederer confirmed that his concern was one of "officer[] safety."[11] Officer Johnson seemed to appreciate this concern, and the two of them discussed other potential courses of action.

---

[10] R.67-3 at 29:32-30:15; R.67-4 at 30–31.

[11] R.82-3 at 66.

After some deliberation, the officers ruled out one such course of action: arresting RJ. Officer Johnson told Amylyn that they did not plan to arrest RJ, and he explained to Amylyn certain options she had, including going to the courthouse in the morning and asking the court to commit RJ to a hospital on account of his suicide risk. Amylyn then said to them: "I have proof that he tried to attempt suicide before. Will that help? … [H]e sent me a picture of his gun against his head recently."[12] Amylyn showed the officers the picture, and Officer Johnson told her, "Wait right here for me."[13]

The officers walked over to RJ and suggested that he go to a nearby hospital to "get checked out."[14] They assured him that they would not go with him to the hospital and that they would not show anyone else the picture in which he was pointing a gun to his head. They also told him that if he did not agree to go to the hospital, they could compel him to stay there for a week. But if he went on his own accord, Officer Roederer said, "you don't have to stay in there."[15] Officer Johnson twice told RJ that he would prefer that RJ go voluntarily, because otherwise he would have to type up a report.[16] RJ reluctantly agreed. The officers called an ambulance, which arrived at around 12:40 a.m. Officer

---

[12] R.67-3 at 39:10-21; R.67-4 at 41.

[13] R.67-3 at 44:25-27; R.67-4 at 47.

[14] R.67-3 at 44:59-45:02; R.67-4 at 48.

[15] R.67-3 at 48:10-13; R.67-4 at 53.

[16] *See* R.67-4 at 48 ("I'd rather for you to do it voluntarily, or -- you know, so now I got to type a report."); *id.* at 51 ("If you're willing to go -- or if not, I go back to the station, type up papers, then I got to corroborate everything it says in there.").

Johnson told the EMTs: "This is RJ. Man, he got into it with his wife. He was having a bad day. Problems -- you know, he wants to voluntarily get checked out."[17]

The officers then went back to speak with Amylyn. The conversation that followed is at the center of this case:

| | |
|---|---|
| OFFICER JOHNSON: | Are you going to go to your house? You're -- you're going to be at your parents' house? |
| AMYLYN SLAYMAKER: | Well, you -- you said it's a 24-hour thing, right? For an evaluation? |
| OFFICER JOHNSON: | Yeah … .[18] |

The conversation continued, eventually returning to the topic of where Amylyn planned to stay that night:

| | |
|---|---|
| OFFICER JOHNSON: | Okay, so are you going to go to your house? |
| AMYLYN SLAYMAKER: | Well, tonight, yeah. |
| OFFICER JOHNSON: | Are you going to -- |
| AMYLYN SLAYMAKER: | You said it's a 24 hour? |
| OFFICER JOHNSON: | Yeah. So are you going to get the guns and everything when you go home? |

---

[17] R.67-3 at 1:02:39-47; R.67-4 at 73.

[18] R.67-3 at 1:08:03-15; R.67-4 at 77–78.

AMYLYN SLAYMAKER:    Yeah, I'm going to take them
                                    with me to my parents'.[19]

According to Ms. Rakes, these exchanges indicate that, at some time earlier that night, the officers told Amylyn that they would send RJ to the hospital with instructions for hospital staff to put him under a 24-hour mental health hold. The officers were permitted to put RJ under such a hold by state law,[20] and they were required to do so by their department's policy.[21]

Everyone eventually left the scene, but not long afterwards, Officer Johnson got a call from Amylyn. She told

---

[19] R.67-3 at 1:29:24-33; R.67-4 at 97.

[20] At the time, Indiana law permitted law enforcement to transport a person who has a mental illness, is dangerous, and "is in immediate need of hospitalization and treatment" to a nearby hospital, and to detain that person for up to 24 hours. *See* Ind. Code § 12-26-4-1 *et seq.* (repealed in 2023); *see also T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 n.1 (Ind. 2015) (describing circumstances under which the state law then in effect permitted involuntary civil commitment).

[21] Under the policy,

> A Department officer …, who during the course of their duties as a law enforcement officer, has reasonable grounds to believe that an individual is mentally ill, dangerous to themselves or others, and/or in immediate need of hospitalization and treatment shall:
>
> 1. Exercise immediate twenty-four (24) hour detention for mental evaluation authority provided for in Indiana Code 12-26-4.
>
> 2. Summons an ambulance to transport the individual to the nearest medical facility with psychiatric intake personnel … .
>
> 3. Complete a narrative style report or proper facility form(s) … .

R.48-3.

him that she had found a scratch on her arm that was consistent with having been hit by RJ's gun in their fight earlier. Amylyn went to the police station and showed Officer Johnson the scratch. Officer Johnson summarized the conversation that followed in a report he filed at least one day later (*i.e.*, after he learned about the murder-suicide). In that report (the veracity of which Ms. Rakes questions), Officer Johnson wrote that he told Amylyn to "make sure to get the other two AR-15s and stay at her mother['s] house."[22] He also wrote: "Amylyn asked several times how long will [RJ] be in the hospital. Officers told her we did not know."[23]

Meanwhile, RJ walked into the hospital at approximately 1 a.m., alone. He received a psychiatric evaluation and was discharged at 3:41 a.m. Sometime after that, he went home and shot Amylyn in the head with one of his AR-15s. He sent a message to his mother at 7:49 p.m. the following evening, stating that he had killed Amylyn because she had "[s]crewed [him] so bad."[24] RJ sent his mother another message at approximately 11:43 p.m. (by now, nearly 24 hours after RJ entered the hospital). The message stated: "I'm not going to prison. Amylyn is dead. And so am I."[25] RJ's mother called the police department to request a welfare check, which prompted officers to go to RJ and Amylyn's house at around

---

[22] R.67-9 at 15.

[23] *Id.*

[24] R.82-11 at 2.

[25] R.67-11 at 6.

midnight. The officers found both RJ and Amylyn dead. Amylyn's body was "cold to the touch."[26]

Amanda Rakes, the administrator of Amylyn's estate, brought this action in the United States District Court for the Southern District of Indiana. Her complaint sets forth a substantive due process claim under 42 U.S.C. § 1983 and a gender-discrimination conspiracy claim under 42 U.S.C. § 1985. She named as defendants Officer Roederer and, because Officer Johnson died between the events in question and the filing of this suit, Officer Johnson's estate. The defendants moved for summary judgment on both claims.

The district court granted summary judgment to the defendants. The court noted that Ms. Rakes's substantive due process claim was based on the premise that the officers had told Amylyn "that RJ would be held for 24 hours at the hospital and that it therefore was safe for her to go home." *Rakes v. Roederer*, No. 4:21-cv-00114, 2023 WL 2712370, at *16 (S.D. Ind. Mar. 30, 2023). It then held that Officer Roederer was entitled to qualified immunity because, in the district court's view, there was no evidence that he had made any assurances to Amylyn and there was generally a "lack of evidence of any personal involvement" on his part. *Id.* at *18 n.8.

The district court also held that Officer Johnson was entitled to qualified immunity. Here, the court focused on the time that Officer Johnson had spent trying to talk Amylyn into staying at her parents' house. It further deemed significant that "RJ had been a danger to Amylyn for months before the incident and would likely have continued to be so even if he

---

[26] R.67-12 at 2.

had been held for 24 hours at the hospital." *Id.* at *18. Finally, the district court separately rejected Ms. Rakes's gender-discrimination conspiracy claim. It entered summary judgment for the defendants on both claims.

Ms. Rakes appealed the district court's grant of summary judgment on her substantive due process claim.

We review de novo a district court's decision granting summary judgment. *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023). Summary judgment is appropriate if "there is no genuine dispute of fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, we view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Pierner-Lytge*, 60 F.4th at 1043.

The main basis for the district court's grant of summary judgment was its conclusion that the defendants are entitled to qualified immunity. "Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: '(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (quoting *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013)). "If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Id.*

The Due Process Clause of the Fourteenth Amendment generally does not impose a duty upon the State to protect individuals from harm by private actors. *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189

(1989), embodies that principle. *DeShaney* involved a due process claim brought on behalf of a young boy who was abused by his father. *Id.* at 191. County social workers became aware of suspicious injuries and other signs of abuse but took no action to remove the child from his father's custody. *Id.* After the latest and most severe beating left the boy permanently disabled, the father was arrested and convicted of child abuse. *Id.* at 193. The boy's mother then brought a section 1983 action against the county and the social workers. She claimed that they had violated her son's right to due process of law. *Id.* The Supreme Court articulated the general principle that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. It accordingly rejected the mother's claim because "the State had no constitutional duty to protect [the boy] against the father's violence." *Id.* at 202.

Although state officials do not have a federal constitutional duty to protect individuals not in custody, they do have a duty not to "needlessly create risks of harm." *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012). Indeed, the Court indicated as much in *DeShaney*, when it emphasized, no less than three times, that the defendants played no part in the creation of the danger the boy faced. 489 U.S. at 197, 201, 201–02. Accordingly, although mindful of *DeShaney*, we have recognized in several decisions that state officials can, in limited circumstances, be held liable under § 1983 for unjustifiably placing a person at risk of harm from third parties. *See, e.g.*, *Paine*, 678 F.3d at 510–11 (police could be liable under § 1983 for arresting woman in safe area and releasing her in area with an exceptionally high crime rate); *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993) (police

could be liable under § 1983 for arresting car driver and leaving keys in hands of intoxicated passenger). We have termed such claims state-created danger claims and called the resulting doctrine the state-created danger doctrine. Most other circuits have recognized a version of this doctrine. *See Irish v. Fowler*, 979 F.3d 65, 67, 73 (1st Cir. 2020) (collecting cases from nine circuits and joining those circuits).

The state-created danger doctrine has important limits. First, the plaintiff must show that "the state affirmatively place[d] the individual in a position of danger the individual otherwise would not have faced." *Wallace v. Adkins*, 115 F.3d 427, 430 (7th Cir. 1997). Second, the plaintiff must show "that the state's failure to protect him from that danger was the proximate cause of his injury." *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 988 (7th Cir. 2021). "Finally, because the right to protection against a state-created danger arises from the substantive component of the Due Process Clause, the state's failure to protect the plaintiff must shock the conscience." *Id.* at 989.

I pause here to clarify two points pertinent to the remainder of the discussion. First, a plaintiff bringing a state-created danger claim need not establish that the defendant official cut off other avenues of aid or rendered the victim unable to help himself. We rejected that requirement in *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998). In that case, we rejected an argument that the state-created danger doctrine contained an "absolute requirement that all avenues of self-help be restricted." *Id.* at 517. We stated that "a state can be held to have violated due process by placing a person in a position of heightened danger without cutting off other avenues of aid." *Id.*

The defendants invite us to reverse course and to require a showing that the State has disabled or undermined self-help or sources of private assistance. But it is hard to see why this showing should be required. Even if the police (for example) have not cut off other avenues of aid, if "the police place a person in a situation in which he is endangered by other private persons[,] the police in effect are their accomplices— unwitting, but if reckless, culpable." *Slade v. Bd. of Sch. Dirs. of Milwaukee*, 702 F.3d 1027, 1030 (7th Cir. 2012). The defendants submit that *DeShaney* requires this showing. However, *DeShaney* made clear that it was not addressing a case in which the State had created the danger the boy faced. It should not be read, therefore, as imposing any particular requirements onto such claims. Most of the other circuits have not imposed this requirement for state-created danger claims. *See* Erwin Chemerinsky, *The State-Created Danger Doctrine*, 23 Touro L. Rev. 1, 15–18 (2014) (surveying circuit decisions). In short, the defendants have not provided a "compelling reason" for overruling circuit precedent. *Wilson v. Cook Cnty.*, 937 F.3d 1028, 1035 (7th Cir. 2019).

The second point warranting mention relates to Officer Roederer's involvement in the alleged constitutional violation. "A governmental actor may be held personally liable only for constitutional violations in which [he] personally participated." *Harnishfeger v. United States*, 943 F.3d 1105, 1122 (7th Cir. 2019). We have previously addressed the application of this principle to the state-created danger context. In that context, if one officer could be held liable for placing an individual in a position of danger, and there is another officer who, with the requisite state of mind, "participa[ted] in the conduct giving rise to the peril," then the second officer can be liable along with the first one.

*Richman v. Sheahan*, 512 F.3d 876, 885 (7th Cir. 2008); *see Paine*, 678 F.3d at 512 (officer could be liable under the state-created danger doctrine when other officers arrested woman in a safe area, the officer ignored phone calls from the woman's mother while the woman was in custody, and the officer failed to return the woman's cell phone to her before she was released by other officers in a dangerous area); *Richman*, 512 F.3d at 885 (explaining that, if two officers arrest a drunk driver and strand the passengers by taking the keys from the ignition and then driving off, both officers can be liable under the state-created danger doctrine, even if only one had removed the keys).

The district court concluded that Officer Roederer was entitled to summary judgment for the independent reason that there was a "lack of evidence of any personal involvement" on his part in the alleged constitutional violations. *Rakes*, 2023 WL 2712370, at *18 n.8. The record does not support this characterization. Officer Roederer played an active role, which included persuading RJ to go to the hospital and convincing Officer Johnson not to send him to pick up the guns from the house. He was also present for many of Officer Johnson's conversations with Amylyn, including the conversation in which Officer Johnson twice indicated that RJ's hospital stay would be a "24-hour thing." Even if Officer Roederer were not the one to tell Amylyn that RJ would be put under a 24-hour hold, or to confirm as much, a jury could find that he played a significant role in the alleged violation.

With these principles and clarifications in mind, I proceed to evaluate Ms. Rakes's state-created danger claim.

To prevail on her state-created danger claim, Ms. Rakes first must show that the officers "placed [Amylyn] in a

position of danger that [s]he would not otherwise have faced." *Wallace*, 115 F.3d at 430. This means that she must stake her claim on "an *affirmative act* on the part of the state," *Stevens v. Umsted*, 131 F.3d 697, 705 (7th Cir. 1997), rather than on a mere failure to protect her from harm. *See Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 918 (7th Cir. 2015) (officer who saw three men carrying intoxicated woman but did not intervene to stop the sexual assault that ensued could not be liable under § 1983); *Windle v. City of Marion*, 321 F.3d 658, 661–62 (7th Cir. 2003) (police officer who did nothing after learning that a teacher was molesting a minor student could not be liable under § 1983).

Ms. Rakes contends that the officers created a danger for Amylyn by falsely telling Amylyn that RJ would be detained at the hospital for 24 hours. Although she has not presented evidence that directly establishes that either of the officers made such a statement, she submits that a jury could reasonably infer—from the department policy, Indiana law, and the exchanges about the "24-hour thing"—that one or both of the officers made such a statement or acquiesced in Amylyn's articulation of it. I agree that a jury could draw that inference.

A jury could conclude that the officers' alleged misrepresentations created a danger for Amylyn that she would not otherwise have faced. According to Ms. Rakes's account (which a jury would be entitled to credit), the officers told Amylyn that they had transferred RJ to the hospital with instructions to keep him detained for 24 hours. In this account, Officer Johnson twice confirmed this misleading statement with Officer Roederer standing by. The misleading statements created a risk that Amylyn would be at the home

when RJ returned, angry at Amylyn and with access to his two AR-15s. This was not a risk Amylyn otherwise faced. RJ posed far less of a risk to her before their encounter with the officers, and he certainly would have posed far less of a risk to her if she had known that he was not in fact being detained. On this record, a jury would be entitled to conclude that, if she had known that RJ might return home that night, she would not have returned to her home but would have gone directly to her parents' house.[27]

Another consideration supports this conclusion. Given Officer Johnson's statements on the dash cam, a jury would be entitled to conclude that, having told her that RJ would not be returning to the home that evening, the officers tasked her with removing the AR-15s before RJ's return, a job that they preferred not to undertake themselves. The record is susceptible to the inference that the officers encouraged her to perform this task so that they would not have to be bothered or endangered. A jury would be entitled to conclude that she not only returned to her home under false assurances of her safety but also based on the officers' encouragement to secure the weaponry present there prior to RJ's return.

Judge Brennan's opinion argues that, given the troubled state of the Slaymaker marriage, the officers did not leave Amylyn any worse off than they had found her. Fairly read, the record supports, and a jury would be entitled to conclude, that Amylyn was hardly left in the situation that she had experienced throughout her troubled marriage to RJ. The

---

[27] Although Judge Brennan's opinion recites several times that the evidence must be interpreted in the light most favorable to the Estate, it does not apply that rule with any consistency.

record makes clear that a chronically bad marital situation had now escalated to a crisis level where the parties not only had irreconcilable differences but could not remain under the same roof without the possibility of deadly violence. More than anyone, the officers understood that the residual discord of the past had reached a new and dangerous level that implicated not only the couple but their children and others such as Amylyn's former husband. They urged her to seek the protection of the courts against further unwanted contact with RJ. They also urged her to abandon her efforts to seek help for RJ and to make her safety and that of her children her primary objective. Amylyn, at least by the end of her time with the officers, understood that she faced a new and more dangerous situation. She made it clear that she would not return to the home if RJ might be there. She went back to the home to collect the AR-15s only on the misrepresentation of the officers that RJ would not be there.

Ms. Rakes next must show that the officers' conduct proximately caused Amylyn's death. Proximate cause in this context is "a fact specific inquiry, involving a consideration of time, geography, range of potential victims, and the nature of harm that occurred." *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 829 (7th Cir. 2009). In this case, the officers and Amylyn expressly discussed the danger that RJ posed to her that night, at the home the two of them shared, if RJ had access to his guns. Indeed, Officer Johnson expressly anticipated that, if RJ were allowed to go voluntarily to the hospital, "the next thing you know, you're back at the house, fighting, guns involved and stuff like that."[28] This case is nothing like cases

---

[28] R.67-3 at 1:00:22-28; R.67-4 at 71.

in which courts have held that a lack of proximate cause defeated a state-created danger claim. *See, e.g.*, *Martinez v. California*, 444 U.S. 277, 285 (1980) (parole board members could not be liable under § 1983 when someone they paroled committed a random murder five months later, because the death was "too remote a consequence" of their parole decision); *Buchanan-Moore*, 570 F.3d at 828–29 (victim of random burglary at hands of mentally ill man prematurely released from jail did not have a valid § 1983 claim). A reasonable jury could certainly find that Ms. Rakes has established proximate cause for purposes of the state-created danger doctrine.

Ms. Rakes also must show that the officers' conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). "[W]hen the circumstances permit public officials the opportunity for reasoned deliberation in their decisions," we will "find the official's conduct conscience shocking when it evinces a deliberate indifference to the rights of the individual." *King v. E. St. Louis*, 496 F.3d 812, 819 (7th Cir. 2007). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). The parties have assumed that deliberate indifference is the proper standard for this case; we will not challenge that assumption.

A jury could reasonably find that the officers were aware of the risk that, if RJ were not detained that night and Amylyn went back to her house, RJ would use his guns to hurt or kill her. The officers knew that RJ was drunk and unstable.

Amylyn told them that he was hitting her and about the threats he was making, and she showed Officer Johnson the alarming texts that RJ sent her just beforehand. Further, Amylyn and the officers discussed at multiple junctures the issue of the AR-15s at Amylyn and RJ's house. Officer Roederer even acknowledged the danger posed by RJ's access to those AR-15s when he said that he would not want to confiscate them himself if RJ were not detained. Amylyn's questions to the officers about the "24-hour thing" also support an inference that the officers were aware of the specific risk. She asked those questions in response to the question of whether she was going to her and RJ's house that night—indicating to the officers that her decision about where to go depended on whether RJ would be detained.

A jury could also reasonably find that the officers acted with deliberate indifference to the danger I have just described. Of all of the options the officers had, they seem to have chosen the one most dangerous to Amylyn: letting RJ go, but nonetheless leading Amylyn to believe that he had been detained. If that is what the officers did, a jury could conclude that they did so because it was safest and most convenient for them. Placating RJ and lying to Amylyn spared the officers from having to deal with the two of them anymore. It also spared the officers from needing to do the paperwork that presumably would have followed an arrest or civil commitment, which was something Officer Johnson twice told RJ he wanted to avoid. In addition, if they did mislead Amylyn, doing so helped them avoid the hassle and potential danger of removing the AR-15s from her and RJ's house. The record clearly allows a jury to conclude that Amylyn agreed to undertake that task without the officers' help only because they lulled her into believing that RJ would be detained while

she completed the task. As Judge Brennan's opinion emphasizes, the officers were at the scene for more than ninety minutes. But the evidence also would allow a jury to find that, during those ninety minutes, they deliberately manipulated the resolution of the encounter to relieve themselves of further work, even though that self-interest exposed Amylyn to a new and immediate danger. The evidence of deliberate indifference, considered in totality, is sufficient to present to a jury for evaluation.

The defendants maintain that, even if Ms. Rakes has established a triable state-created danger claim, they are nonetheless entitled to qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

A plaintiff can demonstrate that a right is clearly established in several ways, one of which is by identifying a "closely analogous case finding the alleged violation unlawful." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620 (7th Cir. 2022). The case must be "controlling," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)), which for our purposes means that it came from the Supreme Court or this court. *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018). The case need not be "directly on point," *Kisela*, 584 U.S. at 104 (quoting *White v. Pauly*, 580 U.S. 73, 79

(2017) (per curiam)), and it need not have held that "the very action in question" was unlawful, *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). But it "must have placed the statutory or constitutional question beyond debate," *Kisela*, 584 U.S. at 104 (quoting *White*, 580 U.S. at 79), and "in the light of pre-existing law the unlawfulness" of the official's conduct must be "apparent," *White*, 580 U.S. at 80 (quoting *Anderson*, 483 U.S. at 640).

Ms. Rakes primarily relies on *Monfils v. Taylor*, *supra*. In that case, an informant told the police about a theft at his workplace, in a call that the police recorded. 165 F.3d at 513. The informant called again later on, and he told the department's deputy chief that he feared that he would be killed or badly hurt if the recording of the call were released. *Id.* at 514–15. The informant asked the deputy chief multiple times whether the police planned to release the recording, and each time the deputy chief told him it would not be released. *Id.* But the department did release it, and the thief obtained it and killed the informant soon afterwards. *Id.* at 515.

We held that the deputy chief could be liable under § 1983 and that he was not entitled to qualified immunity. Critically, we did so, not because the deputy chief was somehow responsible for the recording's release, but because he falsely represented to the informant and others that the recording would not be released. We explained: "[The deputy chief] clearly created a danger and, by assuring Hitt (the assistant district attorney) that he would make sure the tape was not released but not following through, he created a danger Monfils would not otherwise have faced." *Id.* at 518. For this

reason, we concluded that the deputy chief "is not and never was entitled to qualified immunity." *Id.*

*Monfils* rendered it clearly established in this circuit that a police officer can be liable under the state-created danger doctrine if he recklessly and repeatedly lies to a person about the danger that person faces from an identified and violent third party. Respectfully, this core holding of *Monfils* remains good law, despite the defendants' and the statements in Judge Brennan's opinion to the contrary. To be sure, there is dicta in an earlier decision of ours suggesting that *Monfils* "may well have been superseded by" *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005). *Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 599 (7th Cir. 2008). That speculation was, and is, raw dicta and its cold reception by our colleagues in other circuits confirms its unreliability.[29]

The officers' conduct in this case, viewed in the light most favorable to Ms. Rakes, falls squarely within that constitutional prohibition. Indeed, this case presents a more egregious situation than the one presented in *Monfils*. The officers, acutely aware of the danger that Amylyn would face if she were alone at her house with RJ, nevertheless told her to remove RJ's arsenal before his return. Yet, Officer Roederer

---

[29] *See Robinson v. Lioi*, 536 Fed. App'x 340, 345 & n.3 (4th Cir. 2013) (concluding that state-created danger claims were not "foreclosed by *Castle Rock*" because the Supreme Court did not have before it a substantive due process claim); *Caldwell v. City of Louisville*, 200 Fed. App'x 430, 435 (6th Cir. 2006) ("There is nothing in *Castle Rock* that compels a conclusion the Supreme Court intended to eliminate the state-created danger exception to the *DeShaney* rule. This is not surprising since the Court did not have occasion to address or consider the plaintiff's substantive due process claim as it was not before the Court.").

himself admitted that he was not willing to remove RJ's AR-15s from the house unless RJ were detained. Taking the facts in the light most favorable to Ms. Rakes, the officers, although aware that RJ might return to the home at any time, falsely assured Amylyn that he would be absent for 24 hours and that, during that time, she should secure RJ's weapons, a task that they were unwilling to undertake because of its dangerousness. In other words, taking the facts in the light most favorable to the nonmoving party, a finder of fact would be entitled to conclude that the officers repeatedly lied to Amylyn about whether they had placed RJ under a mental health hold and told her to retrieve dangerous weapons while knowing that she might well confront RJ as she did so. Amylyn acted on these misrepresentations and, consequently, died at RJ's hand. On this record, the defendants are not entitled to qualified immunity.

A reasonable jury could find the defendants liable on Ms. Rakes's state-created danger claim, and the defendants are not entitled to qualified immunity. Accordingly, I would reverse the district court's judgment and remand the case for proceedings consistent with this opinion.

BRENNAN, *Circuit Judge.*

Amylyn Slaymaker's murder at the hands of her husband, RJ Slaymaker, is tragic. Her death was the culmination of a long-term abusive relationship in which RJ subjected her to his wrath, threats, and physical violence. Charlestown, Indiana Police Department Officers Te'Juan Johnson and Jonathan Roederer responded to the last occasion of domestic violence before Amylyn's murder. The case against Officer Johnson is remanded for a jury to decide whether he should be held liable for Amylyn's death.

The legal doctrine underpinning the alleged liability—the state-created danger doctrine—has narrow requirements that, in my evaluation, the undisputed evidence here cannot meet. Even more, that evidence entitles the officers to qualified immunity because they did not violate Amylyn's clearly established constitutional rights. On these grounds, I would affirm the district court's decision to grant summary judgment to the officers.

## I. Background

The per curiam opinion provides the relevant facts, but to me two points require greater emphasis. First, RJ victimized Amylyn with pervasive violence for months before the officers arrived that night. Second, the officers stayed with Amylyn for over ninety minutes, continuously reassessing the situation to seek a safe resolution for all the involved parties. I restate the facts pertinent to these points because, in my view, they differ somewhat from the majority opinion's recitation.

Amylyn was in constant danger for months before she was killed. As she explained to the officers, violence and domestic strife had recently defined her marriage with RJ. Over the last

six to eight months they had been fighting daily. RJ had con-
stantly abused Amylyn. He had even shot a firearm at her "a
couple of times" and had been drinking heavily. Amylyn sug-
gested that they separate, but RJ, continuing his pattern of
cruelty, rebuffed those suggestions with threats of suicide.

Fearing for her life, just nine days before her murder, Am-
ylyn wrote a letter to authorities in case "something hap-
pen[ed] to" her.[1] In the letter she documented RJ's abuse—he
had previously tried to choke her to death and threatened to
kill her and her children. She also explained that she shot RJ
in the hand in self-defense. The next day she added to the let-
ter, in which she wrote, "RJ did it again … he threatened me.
… [H]e made me hold his hand [and] try to get me to help
shoot him in the head.[2]

As for the officers' actions that night, from the time they
arrived on the scene, they were constantly talking with Am-
ylyn and RJ, collecting new information, and correcting their
course of action. Their response was to one of the most fluid
and dangerous scenarios for law enforcement: domestic vio-
lence.

When the officers arrived to investigate, they separated RJ
from Amylyn because of the report of a firearm. Roederer de-
tained and spoke with RJ, while Johnson spoke with Amylyn.
Amylyn described what caused the reported fight: RJ had
PTSD, was intoxicated, and had threatened to kill her and her
children. She also told Johnson she had two guns in her purse.
RJ told a different story. He reported that he was a veteran,

---

[1] Dist. Ct. DE 67–17 at 1. The officers did not know about this letter.

[2] *Id*. at 2.

Amylyn did not want him to leave the house because she did not want him to be charged with driving under the influence, their fight was not physical, and he did not pull his gun.

The officers met, discussed what they had been told, and then spoke with Amylyn. She disputed some of RJ's statements. She said RJ had pulled his gun, pistol-whipped her, and attempted to punch her in the face just five minutes before the officers arrived. She said she grabbed her guns because RJ threatened her children and ex-husband that night, even going so far as to send her photos of him driving toward her children's location. Amylyn also explained that RJ was irate because she did not do "sexual stuff" (what turned out to be arranged sexual interactions with strangers). Johnson did not see any bruises or marks on Amylyn at that time. He also encouraged Amylyn to leave RJ, go to court, file for a divorce, and seek an emergency protective order.

Johnson and Roederer decided they could not charge RJ with a crime (including driving under the influence or public intoxication) because of the inconsistencies in the Slaymakers' statements and the lack of visible, physical injury to Amylyn. But they agreed to take RJ's and Amylyn's guns for safekeeping.

Amylyn informed Johnson that there were more guns at her and RJ's residence, including two AR-15s, and she asked if Johnson could retrieve them. The two discussed the possibility of Amylyn staying at her parents' home for the night. But Amylyn was concerned that leaving RJ alone would result in him attempting to destroy their house. Meanwhile, Roederer told RJ that he would not be charged, he would need a ride home, and they were taking his handgun for safekeeping until he sobered up.

The officers were uncomfortable with the idea of taking RJ back to the home, picking up the AR-15s, and taking them back to the police station, in light of Amylyn's revelation that RJ previously "tried to burn the house down." The two agreed to take RJ to the police station, take Amylyn home to retrieve the guns, and then to take RJ home while Amylyn went to her parents.

Amylyn again raised her fear that RJ would burn down their house if left alone. Johnson tried to convince Amylyn not to return to the home she shared with RJ. Johnson reminded her, "a home can be replaced. Your life can't." He advised her to go to court, get a no-contact order, file for divorce, and split up from RJ. And Johnson went so far as to caution her that if their kids were present, child protective services would get involved and "[her] kids are going to be taken away."

After Amylyn mentioned that, to her knowledge, RJ had never had a mental health evaluation, Roederer explained the process for obtaining a mental inquest warrant. Johnson also asked Amylyn to share a photo she mentioned of RJ holding a gun to his head. Roederer and Johnson then returned to RJ.

When the officers mentioned the photo and a voluntary admission for medical treatment to RJ, he became irate and worried about the loss of his gun rights. Eventually, Johnson convinced RJ to agree to talk to somebody confidentially. Johnson told RJ that he needed to "follow through" with their agreement, and that if things escalated again, he would have to turn over the photo. Johnson relayed the agreed upon message to Emergency Medical Services (EMS) that RJ was involved in a domestic dispute with his wife and wanted to voluntarily speak about his mental health issues. EMS then transported RJ to Clark Memorial Hospital at 12:43 A.M. RJ arrived

at the emergency department roughly fifteen minutes later. He remained there until his discharge at 3:41 A.M.

After EMS took RJ from the scene, Johnson asked Amylyn if she was going to her parents' house. Amylyn responded, "Well, you – you said it's a 24-hour thing right? For an evaluation?" Johnson replied, "Yeah, so what are you going to do?" Johnson explained that they took RJ's gun and were going to leave Amylyn's guns with her. One final time, Johnson and Amylyn discussed her plan for the rest of the night:

> Johnson: [W]hat's the plan? Like, what --
>
> Amylyn: I'm going to have to stay with my parents, I guess.
>
> Johnson: Okay. So are you going to go to your house?
>
> Amylyn: Well, tonight, yeah.
>
> Johnson: Are you going to –
>
> Amylyn: You said it's a 24 hour?
>
> Johnson: Yea. So are you going to get the guns and everything when you go home?
>
> Amylyn: Yeah, I'm going to take them with me to my parents'.

About half an hour later, Amylyn called Johnson to report she found a visible injury where RJ had hit her. Johnson told her to come to the police station, where he could take a picture of the injury. Consistent with his earlier directions, he again asked Amylyn to retrieve the AR-15s and stay at her mother's house. At the station Amylyn again asked how long RJ would be at the hospital. The officers present, including Johnson,

informed her that they did not know, and Johnson again directed her to take the opportunity to gather her things and go to her parents' house. When asked if she was going to go to her parents' house, Amylyn reportedly stated "yes."

Amylyn never made it to her parents' house. Sometime after the hospital discharged RJ, he returned home, murdered Amylyn, and then killed himself.

Amylyn's Estate filed suit against the officers, bringing claims under 42 U.S.C. §§ 1983 and 1985. Relevant here, the Estate's § 1983 claim alleges the officers "affirmatively placed Amylyn in a heightened state of special danger that [she] would not otherwise have faced when they falsely told Amylyn that RJ would be in the hospital for 24 hours and it was safe to return home."

The officers moved for summary judgment. The district court granted the officers' motion and dismissed both claims. On the Estate's § 1983 claim, the court found qualified immunity shielded the officers from liability because "there was not clearly established law in effect … that put Officers Roederer and Johnson on notice that their actions violated Amylyn's constitutional rights."

The Estate now appeals the dismissal of its § 1983 claim at summary judgment, offering two arguments. First, the Estate argues the facts satisfy the narrow criteria to succeed on a state-created danger claim under *DeShaney v. Winnebago*, 489 U.S. 189 (1989), and subsequent authorities. Second, the Estate asserts qualified immunity is not available because "it was clearly established that misleading victims about violent threats" violates the victims' due process rights.

## II. State-Created Danger

I do not see the undisputed evidence giving rise to a viable *DeShaney* state-created danger claim.

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. This language "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney*, 489 U.S. at 195. That is, the Due Process Clause is meant "to protect the people from the State, not to ensure that the State protect[s] them from each other." *Id.* at 196. Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. This court does recognize two exceptions to this general rule: (1) the "special relationship" exception; and (2) the "state-created danger" exception. *See Doe v. Village of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015); *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998).

The state-created danger exception "exists when the state affirmatively places a particular individual in a position of danger the individual would not have otherwise faced." *Doe*, 782 at 916 (cleaned up). But it is a "narrow one," and applies in "rare and often egregious" circumstances "where the state creates or increases a danger to an individual." *Id.* at 917.

Our court has recognized three principles to guide the inquiry. First, "the state, by its affirmative acts, must create or increase a danger faced by an individual." *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 818 (7th Cir. 2007). "Second, the failure on the part of the state to protect an individual from

such a danger must be the proximate cause of the injury to the individual." *Id.* "Third, … the state's failure to protect the individual must shock the conscience." *Id.* If no basis exists in the record to support any of these requirements, a plaintiff cannot make out a state-created danger claim as a matter of law.

Roederer and Johnson did not act affirmatively to create or increase danger to Amylyn, proximately cause Amylyn's death, or act in a manner that shocks the conscience.

### A. Create or Increase Danger

The Estate argues that the officers "created a danger" for Amylyn by informing her that RJ would be detained for twenty-four hours and concealing information from EMS that would have resulted in a statutory mental evaluation.

The first principle of our circuit's state-created danger analysis is "the key one." *Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 599 (7th Cir. 2008). We must be wary of interpreting this principle "so broadly as to erase the essential distinction between endangering and failing to protect" to avoid circumventing *DeShaney*'s general rule. *Doe*, 782 F.3d at 917 (quoting *Sandage*, 548 F.3d at 599). "Increasing" danger means "the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Sandage*, 548 F.3d at 600. That is, the state's affirmative, intervening act must move the victim from a position of safety to a position of danger. *Id.* at 598. Even if the action could be considered "affirmative," "we must then ask what new danger would have otherwise befallen the victim." *Windle v. City of Marion*, 321 F.3d 658, 662 (7th Cir. 2003). The burden rests on the Estate to show that the

officers "failed to protect [Amylyn] from a danger they *created or made worse*." *Id.* (emphasis in original). In many of our cases applying the state-created danger exception, this has been the line dividing successful and unsuccessful claims.

To synthesize, the first principle of the state-created danger exception can be viewed as a spectrum from safety to danger. The exception can provide for liability only if an officer's action moved the plaintiff up the scale toward danger. But liability cannot attach if the officer left the plaintiff as is, or (especially) if the officer moved the plaintiff toward safety. To me, five cases flesh out the exception. *See Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993); *Monfils*, 165 F.3d 511; *Paine v. Cason*, 678 F.3d 500 (7th Cir. 2012); *Windle*, 321 F.3d 658; *Doe*, 782 F.3d 911.

Three of these cases show how law enforcement action crosses the line into liability—*Reed*, *Monfils*, and *Paine*. In *Reed*, this court held that police officers could face liability under the state-created danger exception where they arrested a sober driver and left an intoxicated passenger with the vehicle's keys, enabling the intoxicated passenger to drive from the scene, cause a collision, and injure the plaintiffs. 986 F.2d at 1127.

In *Monfils*, our court concluded that the actions of a law enforcement officer subjected him to § 1983 liability under a state-created danger theory. 165 F.3d at 518. Monfils had informed the authorities that one of his coworkers was going to steal electrical cord from their workplace. *Id.* at 513. Aware of his coworker's desire to identify the informant, Monfils repeatedly—on four separate occasions over ten days—contacted the Green Bay Police Department or the district attorney's office urging them not to release a recording of his call

to law enforcement. *Id.* at 513–15. Every time Monfils spoke with a law enforcement official after his initial call, he asked whether the recorded conversation of that call would be released. *Id.* On each occasion, law enforcement assured Monfils the tape would not be released. *Id.* Despite knowing that the tape's dissemination would subject Monfils to danger, the Deputy Chief of Detectives, James Taylor, did nothing to prevent divulgence to the public despite Monfils' multiple pleas over many days. *Id.* at 514–15. Monfils' coworker obtained a copy of the tape, recognized Monfils' voice, and, along with five others, murdered Monfils. *Id.* at 513, 515.

*Paine* involved the arrest of a woman by law enforcement in a safe area and her subsequent release in a dangerous area. 678 F.3d at 509. The woman—while in an acute manic phase—was arrested at Chicago's Midway Airport and released by police the next day near a public housing project with an "exceptionally high crime rate." *Id.* at 504. The police failed to return her cell phone, the woman did not know where she was, and she was unwell. *Id.* Five hours after her release, a man raped her at knifepoint in a nearby apartment. *Id.* at 505–06. Attempting to escape, the woman jumped out the apartment's window, fell seven stories, and suffered severe brain damage. *Id.* at 506.

In each of these cases, liability attached because the involved officers "changed a safe situation into a dangerous one," *Reed*, 986 F.2d at 1127, or "created a danger [the victim] would not have otherwise faced." *Monfils*, 165 F.3d at 518.

*Windle* and *Doe* are on the other side of the liability line. *Windle* evaluated whether a Marion, Indiana Police Department sergeant violated a minor's due process rights by failing to intervene to protect her from molestation perpetuated by a

teacher. 321 F.3d at 660. The sergeant intercepted several cell phone conversations between the minor and the teacher, the content of which evidenced an ongoing sexual relationship. *Id.* However, the sergeant did not intervene for two months. *Id.* In *Doe*, this court affirmed a district court's dismissal of another state-created danger case. 782 F.3d at 913. An officer responded to a 9-1-1 call about a minor female drinking with a group of teenage boys outside an apartment complex. *Id.* She was intoxicated; one of the group was holding her up when the officer arrived. *Id.* The officer did not check identification (which meant he did not discover that one of the boys was an adult on probation), called off another responding officer, and allowed the group to leave with the girl. *Id.* The group then carried the girl into the complex's laundry room, where the probationer sexually assaulted her. *Id.*

In these two cases, the state-created danger claim failed at the affirmative act prong because the officer's conduct did not "proactive[ly] creat[e] or exacerbat[e] [] danger," *Windle*, 321 F.3d at 662. Nor were the victims "safe, or even considerably safer," before the officers acted. *Doe*, 782 F.3d at 918. Rather, the victims "[were] in actual danger already." *Id.*

These five cases accurately set forth the requirements for when and how an officer may act affirmatively to create or increase danger to a plaintiff. Before an officer acts, danger to the victim must be nonexistent or only potential. State-created danger liability attaches only where state actors turn a nonexistent or potential danger into an actual one or create some risk for the victim. Such was the case in *Reed*, *Monfils*, and *Paine*. Where no new danger befalls the victim, such as in *Windle* and *Doe*, state actors cannot be held liable.

This case is analogous to *Windle* and *Doe* and distinguishable from *Reed*, *Monfils*, and *Paine*. As in both *Windle* and *Doe*—and unlike in *Reed*, *Monfils*, and *Paine*—the officers' actions did not create a new danger to Amylyn or otherwise increase an existing danger. "To create" danger means to bring danger into existence. Likewise, "to increase" danger means to escalate the likelihood that danger will occur. In the context of private violence, the state must do something "that turn[s] a potential danger into an actual one" rather than merely standing by and doing nothing. *Sandage*, 548 F.3d at 600.

Johnson's two brief replies ("yeah"/"yea") to Amylyn's questions about the length of RJ's detention did not create any new dangers, increase the likelihood of danger, or otherwise propel Amylyn into danger. She was already in grave danger when the officers arrived to intervene between Amylyn and RJ. As Amylyn herself recorded more than a week prior, RJ had consistently abused her over the previous six to eight months. The abuse escalated to the point where Amylyn shot RJ in self-defense. Further, the officers left Amylyn (or at least attempted to leave her) in a better position than she had been on that night. By taking RJ's gun and leaving Amylyn in possession of hers, they deprived RJ of a means to escalate his violent abuse and left Amylyn with recourse to self-defense.

For the same reasons, the officers' statements to EMS are not an affirmative act propelling Amylyn into danger. To the extent the Estate argues that the affirmative act was a failure to comply with department policies, "§ 1983 protects plaintiffs from constitutional violations, not violations of … departmental regulations and police practices." *Thompson v. Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). The officers' failure to follow Charlestown Police Department policy "or even a state

law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Id.*

My colleagues conclude that Johnson created a danger to Amylyn that she would not have otherwise faced because the officer's statements escalated a risk that she would encounter an enraged RJ at their home with ready access to two AR-15s. This takes too narrow of a view of the undisputed facts and of the risk Amylyn had consistently faced for a long time. Johnson did not make new and immediately dangerous the already incendiary circumstances between RJ and Amylyn. The possibility of deadly violence between these spouses had existed for many months. Choking, threats to kill, a request to help attempt suicide—Amylyn documented all this more than a week before the officers ever spoke with the couple. Before his discharge from the hospital and return home, RJ had already shot a firearm at Amylyn a couple of times, and she had returned fire in self-defense. In advance of these officers ever entering the picture, Amylyn had described in writing RJ's threats, abuse, use of firearms, and her fear for her life.

RJ created the danger, not the actions of the officers. By telling Amylyn that RJ would be held for 24 hours, the officers did not affirmatively act to create or increase any danger to Amylyn. The affirmative act requirement means that "state actors may not disclaim liability when they themselves throw others to the lions." *Pinder v. Johnson*, 54 F.3d 1169, 1177 (4th Cir. 1995) (citing *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990)) (rejecting mother's characterization of her claim that officer's false assurance—that it was safe to return to work—and failure to charge ex-boyfriend was an affirmative action resulting in her children's death). But that

requirement does "not … entitle persons who rely on promises of aid to some greater degree of protection from lions at large" to impose liability on state actors. *Id.* To decide otherwise subjects "every representation by the police and every failure to incarcerate" to liability. *Id.* at 1175. And it interprets the state-created danger exception "so broadly as to erase the essential distinction between endangering and failing to protect," which we should not do. *Sandage*, 548 F.3d at 599.

Without a basis to characterize the officers' statements to Amylyn as affirmative actions that created or increased the risk of danger, the inquiry could end here. *See King*, 496 F.3d at 818 (affirming district court's summary judgment ruling based solely on one prong of the state-created danger exception). To be complete, though, I next address the exception's second and third prongs.

### B. Proximate Cause

The state's failure "to protect an individual from [] a danger must be the proximate cause of the injury to the individual" for *DeShaney* liability to attach under the state-created danger exception. *Id.* The individual must be a foreseeable victim of the government's acts. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009). "To satisfy the proximate cause requirement, the state-created danger must entail a foreseeable type of risk to a foreseeable class of persons." *First Midwest Bank, Guardian v. City of Chicago*, 988 F.3d 978, 988–89 (7th Cir. 2021) (citing *Buchanan-Moore*, 570 F.3d at 828). "A generalized risk of indefinite duration and degree is insufficient." *Id* at 989.

Analogizing to *Reed* and distinguishing *Buchanan-Moore*, the Estate asserts it was foreseeable that RJ would kill Amylyn

as a result of the officers' actions. In *Reed*, proximate cause existed because "[t]he dangers presented by drunk drivers are familiar and specific; in addition, the immediate threat of harm has a limited range and duration." 986 F.2d at 1127. In *Buchanan-Moore*, this court held that the plaintiff failed to allege facts making out proximate cause where law enforcement arrested and then released a mentally unstable individual who went on to murder a resident of the north Milwaukee suburbs. 570 F.3d at 826. Because the complaint alleged no facts that the County knew of a special danger to the resident, rather than the public at large, and because the unstable individual's "mental illness and propensity for criminal acts existed without temporal boundaries," the plaintiff's claim failed. *Id.* at 828–29.

Like the dangers of drunk driving apparent in *Reed*, but unlike the danger posed by the unstable individual in *Buchanan-Moore*, the Estate posits "domestic violence involves a type of risk that is familiar, specific, and limited in time and scope to a foreseeable class of persons." This argument is incorrect twice over. First, though RJ's abuse was certainly specific and limited to a foreseeable class of persons—Amylyn—RJ's conduct was not so limited in time and scope as the Estate characterizes it. The undisputed facts illustrate at least six to eight months of verbal and physical abuse accentuated by RJ's mercurial temper and unpredictable actions. RJ posed a generalized risk to Amylyn's life of indefinite duration and degree. As Amylyn explained in her letter, RJ's abusive conduct was ongoing for many months, with no discernible end in sight, so long as Amylyn remained with RJ. And as Amylyn herself explained to Roederer and Johnson, RJ heightened his physical and emotional abuse whenever Amylyn raised the

prospect of splitting up.[3] RJ, the abuser, was exercising power and control over Amylyn, and had done so for many months. The officers' representations to Amylyn or EMS were not the cause of Amylyn's death—RJ was.

Second, RJ's conduct posed a danger more comparable to that of the unstable individual in *Buchanan-Moore*. Again, RJ had been perpetuating the abuse—violence; forcing Amylyn into unwanted sexual situations with strangers; threatening to kill her, her ex-husband, and her children; and property destruction—for many months. Like the unstable individual in *Buchanan-Moore*, RJ's abusive conduct had no temporal boundaries. Therefore, the Estate cannot establish the proximate causation requirement.

## C. Shock the Conscience

"Conduct … which shocks the conscience is that conduct which may be deemed arbitrary in the constitutional sense." *King*, 496 F.3d at 818 (quotation marks omitted). Though the inquiry is "necessarily fact-bound," the "emphasis on whether conduct shocks the conscience points toward the tort law's spectrum of liability." *Id.* at 818–19. "Only conduct

---

[3] The United States Department of Justice defines domestic violence as "a pattern of abusive behavior … that is used by one partner to gain or maintain power and control over another intimate partner." https://www.justice.gov/ovw/domestic-violence (last viewed September 25, 2024). Domestic violence is not limited to physical abuse. The underlying problem is the abuser's need to exercise power and control. "Domestic violence can be physical, sexual, emotional, economic, psychological, or technological actions or other patterns of coercive behavior that influence another person within an intimate partner relationship. This includes any behaviors that intimidate, manipulate, humiliate, isolate, frighten, terrorize, coerce, threaten, blame, hurt, injure, or would someone." *Id*.

falling toward the more culpable end of the spectrum" shocks the conscience. *Id.* at 819. This court has noted—though not specifically in the state-created danger context—that such conduct generally "involves the use of intentional force against an individual's person or the threat of such force." *Robbin v. City of Berwyn*, 108 F.4th 586, 591, (7th Cir. 2024) (collecting cases).

This court has held that "when the circumstances permit public officials the opportunity for reasoned deliberation in their decisions, we shall find the official's conduct conscience shocking when it evinces a deliberate indifference to the rights of the individual." *King*, 496 F.3d at 819. Where officials must make hurried judgments, "render[ing] reasoned deliberation impractical," conduct shocks the conscience only where it "approach[es] malicious or intentional infliction of injury." *Id.* Crucially, "the conduct must be more culpable than mere negligence, which is 'categorically beneath the threshold of constitutional due process.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *see Est. of Her v. Hoeppner*, 939 F.3d 872, 877 (7th Cir. 2019) (same); *see also Daniels v. Williams*, 474 U.S. 327, 331 (1986) (describing the due process guarantee as historically applying only to "deliberate" actions and decisions of government officials).

The Estate argues that "[t]he combination of the passage of time, the repeated and knowing lies, and the continued disregard for Amylyn's safety amounts to deliberate indifference." But the facts, viewed in the light most favorable to the Estate, do not support that assertion. Over the course of more than 90 minutes, the officers:

- separated and questioned Amylyn and RJ;

- interviewed the 9-1-1 callers;

- confiscated RJ's gun but permitted Amylyn to keep her firearms;

- advised Amylyn to retrieve the remaining firearms from her house and to spend the night at her parents' residence;

- counseled her to do what was right to protect herself and her children; and

- encouraged her to obtain an emergency protective order, twice suggested that she seek a divorce, and advised her of the process to obtain a mental inquest warrant.

These facts do not show the officers as deliberately indifferent toward Amylyn's personal safety and security. Their consistent reassessment of the information they collected undercuts a suggestion of deliberate indifference. For example, once Johnson informed Roederer that RJ had previously tried to burn the house down and the officers discussed RJ's mental state, they decided they would not take RJ back to the house where the AR-15s were located.

Johnson's affirmative responses to Amylyn's question about the length of RJ's detention were at most negligent, based on his understanding that Amylyn would go to her parents' house that night. But negligent conduct does not suffice to meet the high bar of action that shocks the conscience. *King*, 496 F.3d at 819.

*       *       *

If the Estate cannot satisfy just one of the three elements underlying the state-created danger exception, the officers

cannot be held liable. Because they did not act to create or increase danger, proximately cause death, or act in a manner that shocks the conscience, the district court's grant of summary judgment should be affirmed.

### III. Qualified Immunity

Even if the Estate could succeed on the *DeShaney* question, the officers are entitled to qualified immunity because they did not violate a clearly established right. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances … the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

Two questions guide the qualified immunity analysis: "first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second whether the federal right at issue was clearly established at the time of the alleged violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). Even assuming the officers' actions violated Amylyn's constitutional rights, the federal right at issue was not clearly established at the time of the alleged violation.

It is the Estate's burden to demonstrate the existence of a clearly established right at the time of the alleged violation. *See Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). "A

constitutional right is clearly established if the right in question is sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Finkley*, 10 F.4th at 742 (quotation marks omitted). "The clearly established right must be defined with specificity," *id.* (citing *City of Escondido v. Emmons*, 568 U.S. 38, 42 (2019)) (cleaned up), a requirement the Supreme Court has made clear "[o]ver and over." *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019) (collecting cases).

To determine whether the right is defined with the requisite specificity, "we analyze whether precedent squarely governs the facts at issue, mindful that we cannot define clearly established law at too high a level of generality." *Finkley*, 10 F.4th at 742 (cleaned up). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). "In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Id.* (quotations omitted); *see also Doe*, 782 F.3d at 915 ("[T]he plaintiff must demonstrate either that a court had upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right."). That is, the cited precedent "must share specific details with the facts of the case at hand." *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022) (citing *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)).

To the Estate, the officers violated a clearly established right, contending "[t]here is authority within this circuit and

others that false promises of security are deliberately indifferent." The Estate cites *Paine*; *Robinson v. Township of Redford*, 48 F. App'x 925 (6th Cir. 2002); *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006); and *Irish v. Fowler*, 979 F.3d 65 (1st Cir. 2020). But these authorities do not support a conclusion that the officers violated Amylyn's clearly established rights.[4]

My colleagues read *Monfils* as "render[ing] it clearly established in this circuit that a police officer can be liable under the state-created danger doctrine if he recklessly and repeatedly lies to a person about the danger that person faces from an identified and violent third party." I do not read *Monfils* to provide such clarity.

First, *Monfils* is not "particularized to the facts of [this] case." *Pauly*, 580 U.S. at 79. Before the release of the tape, Monfils' identity as the informant was anonymous to his murderous coworkers. The release of the tape recording unmasked Monfils. Here, however, the officers' actions did not strip Amylyn of anonymity. She was known to RJ and the subject of his violence well before the officers intervened.

*Monfils* is described as a case about reckless and repeated lies. But here, Johnson's statements to Amylyn about the

---

[4] *Robinson* and *Irish* may be disposed of immediately. *Robinson* is an unpublished Sixth Circuit opinion reversing a district court's grant of a motion to dismiss a state-created danger claim. 48 F. App'x at 925. That court later affirmed the district court's grant of summary judgment to the defendant law enforcement officers, in part because they were not on notice that their conduct violated a clearly established right. *Robinson v. Township of Redford*, No. 04-1117, slip op. at 10–11 (6th Cir. July 20, 2005). And the First Circuit's *Irish* opinion postdates the events of this case, so it cannot aid the clearly established inquiry. *See Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004).

length of RJ's absence were negligent at most, not reckless. His statements also were not "repeated" like the promise not to release the tape in *Monfils* was repeated. *See* 678 F.3d at 513–15 (four separate promises over ten days). Johnson gave two one-word responses within a lengthy discussion, during which the officers encouraged Amylyn to go to her parents' house that night. And both representations were made during a roughly ninety-minute interaction among the officers, Amylyn, and RJ.

Second, *Monfils* rests on uncertain ground. This court has noted that *Monfils* "may well have been superseded by" the Supreme Court's decision in *Town of Castle Rock v. Gonzales*, 545 U.S. 748. *Sandage*, 548 F.3d at 599.

In *Sandage*, a man named Moore murdered plaintiffs' decedents while on work release as part of a four-year robbery sentence. *Id.* at 596. Twice previously, one of the decedents contacted police to report that Moore was harassing her. *Id.* The plaintiffs sued county officials "claim[ing] that the [sheriff's] department's failure to act on the complaint of harassment by revoking Moore's work-release privilege and reimprisoning him deprived their decedents of their lives without due process of law." *Id.*

As part of its analysis, this court looked to *Castle Rock*. That case involved "police refus[ing] to enforce a domestic-abuse restraining order, despite repeated demands by the woman against whose husband the order was directed, and he murdered the couple's three children." *Id.* at 597. Answering the "technical question" of "whether the State of Colorado had created a property right in the enforcement of restraining orders," *id.*, the Supreme Court held that the answer was no. *Castle Rock*, 545 U.S. at 768. Additionally, the Court noted that

"the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive' manifestations." *Id.*

As this court saw, the plaintiffs' claim in *Sandage* was "similar" to that raised in *Castle Rock*: "that the county was constitutionally required to revoke Moore's work release and return him to custody." 548 F.3d at 597. It would have been the same case as *Castle Rock*, "if Moore had not been serving a sentence but had threatened [the decedent] and she had complained to the sheriff's department, the department had referred the matter to the county prosecutor, and he had decided in a misguided exercise of his prosecutorial discretion not to order Moore arrested and charged." *Id.*

Our court also distinguished *Monfils*. Unlike that case, where "police created the mortal danger to Monfils" by releasing the tape recording, in *Sandage* "the danger was created by Moore, and by Moore alone." *Id.* at 599. Based on that reasoning, the court affirmed the district court's dismissal of plaintiff's suit for failure to state a claim. *Id.* at 600. Critically, in its conclusion the court noted "after *Castle Rock* a broken promise—the essential act of which both the plaintiff in that case and the present plaintiffs complain (though there was more in *Monfils*—the handing over the tape to the murderer)—may very well not be enough." *Id.* That should be true here. The essential act identified by the Estate and the panel majority is a false promise of security. After *Castle Rock*,

such an act likely does not dispel the protections of qualified immunity.[5]

Next, the Estate urges that *Paine* and this case are the same because the officer's misrepresentations to Amylyn made her "more vulnerable than she otherwise would have been." *Paine* "clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution." 678 F.3d at 510. But as discussed above, *Paine* is not sufficiently analogous to this case. The officers here did not make Amylyn more vulnerable to any danger posed by RJ. Amylyn was in grave danger before and after the officers' intervention.

The Estate's reliance on *Paine* is also misplaced because it flies at too high a level of generality, of which the Supreme Court has repeatedly warned. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)); *see also City of Tahlequah v. Bond*, 595 U.S. 9, 11 (2021) (per curiam); *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam). *Paine* does not establish a rule that would have informed the officers

---

[5] For similar reasons, *Kennedy* does not help the Estate. There, a police officer assured the plaintiff that she would be given prior notice of police contact with the family of the boy who had been accused of molesting the plaintiff's daughter. *Kennedy*, 439 F.3d at 1058. After law enforcement officers spoke with the boy's family about the allegations, they made the additional assurance to the plaintiff that police would patrol their neighborhood. *Id.* The boy broke into the home and shot the victim and her husband. *Id.* The Ninth Circuit affirmed the district court's recognition that the officer in that case was not entitled to qualified immunity. But it did so in mitigating fashion: "we do not rest our judgment that [the officer] affirmatively created a danger on [the] assurance [that the police would patrol the neighborhood] alone." *Id.* at 1063. Though "an additional and aggravating factor," the assurance alone was not enough to constitute a due process violation. *Id.*

that their affirmative response to Amylyn's questions about RJ's hospitalization violated her constitutional rights. Cases where qualified immunity has shielded more problematic law enforcement conduct support this conclusion. *See, e.g.*, *Doe*, 782 F.3d at 915, 918 (holding it not clearly established that calling off another police officer, or falsely reporting to dispatch that the scene was clear, resulted in a violation of a constitutional right of a victim of private violence).

The cases the Estate cites do not place the constitutional question beyond debate. If a constitutional right of Amylyn's was violated, it was not clearly established when the officers responded to this domestic violence episode. As a result, qualified immunity shields the officers from § 1983 liability.

### IV. Conclusion

I end where I began: Amylyn was tragically murdered by her husband RJ. The rule is that the state has no duty to protect citizens from private violence. The state-created danger doctrine is a narrow exception to that rule. This decision sends the case against Officer Johnson to a jury when the undisputed facts do not permit liability to attach under the strict limits of this doctrine. And it does so notwithstanding the broad protections of qualified immunity.

SCUDDER, *Circuit Judge*.

This case is difficult on many levels and, in the end, I find myself split on the conclusions reached by my colleagues. I agree with Judge Ripple that the claim against Officer Te'Juan Johnson's estate should proceed to trial. On the other hand, I agree with Judge Brennan and the district court that qualified immunity defeats the claim against Officer Jonathan Roederer. Above all else, this case presents a tragic example of the risks posed by domestic violence and the consequences of law enforcement's failure to appreciate those risks. No matter how many times I review the record, the same conclusion rushes to mind: police departments ought to prioritize training on responses to domestic violence.

## I

Whether the Fourteenth Amendment's Due Process Clause precludes state actors from creating danger to a person remains unanswered by the Supreme Court. We know for certain state actors do not shoulder an affirmative duty to protect individuals from dangers posed by third parties. That is the holding of *DeShaney v. Winnebago*, 489 U.S. 189 (1989). But what the Justices have yet to answer is whether the Due Process Clause, while disallowing duty-to-protect claims, allows a claim in facts and circumstances where state actors create the danger that proximately causes harm to an individual. Circuit courts have struggled with the question in *DeShaney*'s wake. See, *e.g.*, *Est. of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 493–96 (6th Cir. 2019) (Murphy, J., concurring) (identifying unresolved questions about the validity of the state-created danger doctrine).

Our court is among those that have recognized a claim for state-created dangers. See, *e.g.*, *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993); *Monfils v. Taylor*, 165 F.3d 511, 518 (7th Cir. 1998); *Paine v. Cason*, 678 F.3d 500, 509–11 (7th Cir. 2012). Duty bound to follow that precedent, I see it applying in different ways to the two officers in question.

When viewing the facts, as we must, in the light most favorable to Amylyn Slaymaker, a jury could find that Officer Te'Juan Johnson affirmatively placed her in more danger than she faced before law enforcement intervened. Officer Johnson reached an agreement with Amylyn's husband, RJ: if RJ voluntarily went to the hospital, Officer Johnson would not have him committed involuntarily. But when Amylyn asked whether her husband had been placed under a 24-hour mental health hold, Officer Johnson twice answered in the affirmative. Knowing that Amylyn planned to go home, Officer Johnson's misrepresentations—the false sense of safety he conveyed—created a risk that Amylyn would be at the house and caught off-guard when RJ returned and had access to his AR-15s. This is not a risk Amylyn would have faced had she known RJ was free to leave the hospital at a time of his own choosing.

To violate clearly established law—the second prong of the qualified immunity analysis—"existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). I agree with Judge Ripple that our decision in *Monfils* supplies the relevant precedent here. *Monfils* clearly established that a police officer can be liable under the state-created danger doctrine if he makes false promises about the danger a person faces from an identified and violent third party. See 165 F.3d

at 518. Like the officer's false assurances to Thomas Monfils, Officer Johnson's false assurances rendered Amylyn more vulnerable to a danger than she otherwise would have been had he told her the truth. With these findings available to a jury, Officer Johnson is not entitled to qualified immunity and the suit against his estate should proceed.

But not so for Officer Roederer. The record shows that his actions did not add to the risk of harm already created by Officer Johnson. Officer Roederer made no representations to Amylyn regarding how long her husband would be in the hospital or whether it was safe for her to return home. Yes, Officer Roederer was present for Officer Johnson's conversations with both Amylyn and RJ. But his failure to correct any representations Officer Johnson made to Amylyn is insufficient because "mere inactivity by police does not give rise to a constitutional claim." *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015). And Officer Roederer's statements to RJ merely repeated back the arrangement Officer Johnson had previously contrived about going to the hospital voluntarily.

The evidence of Officer Roederer's personal involvement falls short of allowing a jury to find that he created a danger to Amylyn. Even if his acts or omissions contributed to her tragic death, no jury could reasonably conclude that he put Amylyn in a position of danger she would not have otherwise faced or that his actions violated a clearly established right. Indeed, on issues of qualified immunity, close calls go to the defendant. See *Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994) (underscoring that "the point of qualified immunity…is that government officials are not, as a rule, liable for damages in close cases"). So I agree with Judge Brennan that qualified immunity shields Officer Roederer from liability.

## II

This case should sound the equivalent of a five-alarm fire for police departments to the risks of domestic violence. In my view, Officer Johnson's response to what he encountered during the early morning hours of July 19, 2019 remains shocking in the extreme. When you read the facts, you can see the tragic ending coming from a mile away with about 100% certainty.

No doubt domestic violence incidents are among the most challenging circumstances that police officers encounter. And federal judges are in no position to advise police departments on how best to respond to 911 reports of domestic violence. But respond they must. And this case shows just how a police officer can take an already dangerous situation and make it worse—fatally so. The district court got it right when observing that a case like this should cause police departments to reevaluate their training related to domestic violence encounters. Under no circumstance should a law enforcement officer act in a way that escalates the danger faced by someone in the vulnerable and trapped position that Amylyn Slaymaker found herself. See Br. of Amicus Curiae Everytown for Gun Safety and the Indiana Coalition Against Domestic Violence in Support of Pl.-Appellant, ECF No. 15 (collecting social science research on the risk factors of domestic violence).

Judge Brennan's opinion emphasizes that Amylyn was in grave danger before the officers intervened. I could not agree more. Amylyn endured ongoing, violent abuse at the hands of her husband for many months. Nobody could plausibly say that RJ did not pose a serious threat to Amylyn's life on July 19. While accurate, that observation is incomplete and in no way resolves the question before us.

It was Officer Johnson's response that escalated the risk to Amylyn's life. He agreed to allow RJ to voluntarily go to the hospital while affirmatively misleading Amylyn about that fact. A jury could easily find that Officer Johnson's duplicity left her vulnerable to new risk—more immediate and acute risk. These circumstances existed because of Officer Johnson's actions: yes, Amylyn was in an abusive marriage, but she had no idea that Officer Johnson had cut a deal with RJ that would allow him to return home in less than 24 hours, find her there alone, and murder her with one of the guns known to be in the house.

If the state created danger doctrine reflects sound law, it fits this case to a T: a jury could find that Officer Johnson responded to the undeniably difficult situation he encountered on July 19 by putting Amylyn at a very high risk of losing her life. The case against Officer Johnson's estate should go to trial.